[No. 386.    August 19, 1891.]

## JESSE M. ELLIS, APPELLEE, v. JOHN B. NEW-BROUGH AND A. M. HOWLAND, APPELLANTS.

DAMAGES—DECEIT—SUFFICIENCY OF DECLARATION—ESTOPPEL.—In an action of trespass on the case for damages for deceit, where the declaration alleged that, at the time of the grievances complained of, defendants were engaged in organizing a community of "Faith-ists;" that by deceit and fraudulent representations that its property would be held in common and the community conducted on principles of brotherly love and morality, plaintiff was induced to join with defendants, and consecrate his life, labor, and all his effects and prospects, together with those of his two children; that defendants knew at the time of making such false representations that the property would not be held in common by the community, but that the title thereto was then and would in future vest in one of the defendants, and that the community would not be conducted on principles of kindness and equality; that one of the defendants was guilty of acts of tyranny and immorality; and that plaintiff remained a member of said community from October, 1884, to April, 1886, working for the community, and defendants refused to pay him for his labor, whereby plaintiff suffered great damage in his loss of time, labor, mental anguish, humiliation, etc., and the proof was that plaintiff was a man of ordinary intelligence, and himself joined lustily in the exercises and services of song of the aforesaid community, when the ode to "Shalam" was sung in the temple of "Tae" to the "tune of Dixie,"—Held: The declaration does not state a proper cause of action; and, if it did, the allegations and proof would present a clear case of estoppel in "Tae." The court can not give its assent to the view of the counsel for appellee that the ode to "Shalam" sung to the "tune of Dixie" was of itself such an act of disloyalty as to entitle the plaintiff to a verdict.

APPEAL, from a judgment for plaintiff, from the Third Judicial District Court, Dona Ana County. Judgment reversed.

The facts are stated in the opinion of the court.

S. B. NEWCOMB for appellants.

W. C. BOWMAN for appellee.

FREEMAN, J.—This is a most extraordinary proceeding. So far as we have been able to extend our researches, it is without a precedent. It comes to us by appeal from a judgment of the district court for Dona Ana county, refusing to set aside a verdict of a jury in favor of the appellee. It is an action of trespass on the case. The declaration sets out substantially the following cause of action, viz.: That, at the time of the committing of the grievances that the plaintiff complains of, the defendants were engaged "in organizing and establishing a community" called "Faithists," and, being so engaged, the defendants, heretofore, to wit, about the years 1882, 1883, and 1884, wrongfully and corruptly contriving and intending to deceive and injure the plaintiff, issued and published certain false, fraudulent, and deceitful writings, falsely and fraudulently and deceitfully pretending in said writings to describe the true nature and objects of said community, and to set forth the true state of facts in connection with said enterprise, and thereby to induce the plaintiff to believe that said objects and purposes of the defendants, and said facts in connection with said enterprise, were far different from what they really were, and from what said defendants really intended they should be. The declaration then proceeds to set out what it is alleged the defendants held out the enterprise to be, viz.: That the property of the community was to be held in common,—no one individual to have any separate title and property; that said community was to be conducted on principles of brotherly love, without master or leader to exercise control over the members; that all the members were to enjoy equally a permanent place in the community, with no authority on the part of any member or members to exclude another; that said community was laid on principles of sound morality and purity of life; that the plaintiff, misled by these pretenses, was induced to become

a member of the community; "that he did then and there enter into said community with defendants; * * * did consecrate his life, his labor, and all his worldly effects and prospects, together with those of his two children, placing all good faith and confidence in said community; whereas, in truth and in fact, said defendants knew at the time of making said false statements and pretenses that the property of the said community home would not be held in common by the members of said community, but that the title thereto was then and would in future be vested by deed in one individual, to wit, the defendant Andrew M. Howland; and, whereas, in truth and in fact, defendants well knew, at the time of making said false statements and misrepresentations, that said community would not be conducted on principles of equality and kindness, without a master." The declaration then proceeds to charge defendant Newbrough with acts of tyranny, and also with living a life of immorality, etc.; that, by reason of the false representations aforesaid, the plaintiff was induced to become a member of the community; and that he remained a member of such community from October, 1884, until April, 1886, both he and his two children working for the improvement of the home; "and the plaintiff saith that the defendants refused and still refuse, to pay plaintiff for his said work and labor, or any part thereof; by reason whereof plaintiff saith that he has sustained great damage in loss of time and labor and opportunity; and in the education of his children, and that he has suffered great anguish of mind in consequence of the dishonor and humiliation brought upon himself and his children by reason of his connection with said defendants in said community; to the damage of the plaintiff in the sum of $10,000."

To this unique and weird complaint a demurrer was interposed. The second and fourth grounds of demurrer are as follows: "(2) Because there are no

sufficient facts alleged in plaintiff's said declaration to charge these defendants, or either of them, with any liability to plaintiff by reason of the matters by plaintiff in his said declaration complained of;    *    *    *
"(4) Because the said declaration is duplicitous, in this: that plaintiff in his said declaration has attempted to plead more than one, and various and distinct and different causes of action in one and the same count."

We think the court erred in overruling this demurrer. The most that can be gathered from the declaration is that the defendants had conceived some Utopian scheme for the amelioration of all the ills, both temporal and spiritual, to which human flesh and soul are heir; had located their new Arcadia near the shores of the Rio Grande, in the county of Dona Ana, in the valley of the Mesilla; had christened this new-found Vale of Tempe the "Land of Shalam;" had sent forth their siren notes, which, sweeter and more seductive than the music that led the intrepid Odysseus to the Isle of Calypso, reached the ears of the plaintiff at his far-off home in Georgia, and induced him to "consecrate his life and labors, and all his worldly effects," etc., to this new gospel of Oahspe. This much is gathered from the pleadings. The evidence adduced in support of the plaintiff's demand is as startling as the declaration is unique. What the declaration leaves as uncertain, the proof makes incomprehensible. If the court below had been invested with spiritual jurisdiction, it might have been enabled, through an inspired interpreter, to submit to a mortal jury the precise character of plaintiff's demand. We think an examination of the record before us will amply support these conclusions. The first and principal witness offered by plaintiff was himself. He sets out in full the nature of his grievance. He admits, on page 59 of the record, that he made no sacrifice of property to become a member of the organ-

*Margin note:* SUFFICIENCY of declaration.

ization, but that he "threw up a situation" in which he could make a good living. What induced him to make this sacrifice is set out in his testimony. First in order came some specimen of literature published by the society, community, order, church, or "Faithists," as they were pleased to call themselves. Over the objections of the defendants, two books were allowed to go to the jury. The first and larger volume is entitled as follows: "Oahspe: A New Bible in the words of Jehovih and his Angel Embassadors. A sacred history of the dominions of the higher and lower heavens on the earth for the past twenty-four thousand years, together with a synopsis of the cosmogony of the universe; the creation of planets; the creation of man; the unseen worlds; the labor and glory of gods and goddesses in the ethereal heavens. With the new commandments of Jehovih to man of the present day. With revelations from the second resurrection, formed in words in the thirty-third year of the Kosmon era." In the preface to the book it is said of it that "it blows nobody's horn; it makes no leader." It is further stated: "When a book gives us information of things we know not of, it should also give us a method of proving that information true. This book covers that ground." The inspired author of this new revelation was doubtless somewhat familiar with the writings of his early predecessors. He had read of the jealousies that had arisen between Paul and Barnabas, so that he takes occasion in his preface to assure his disciples that these gospels are not intended to establish the fame of anyone,—"it blows nobody's horn." And again having seen innumerable sects spring up as a result of a misconstruction, or rather of a diversified construction, of the earlier gospels, we are furnished with the consoling assurance that this book presents the "method of proving that information to be true." With this comfortable and comforting assurance, the

witness opens this volume of light, and bids us satisfy
the hungry longing of our restless spirits by feasting
our eyes on its simple truths. This new gospel, in
order to prepare our minds for the acceptance and
enjoyment of its simple truths, proceeds to dispel the
mists of superstition that for nearly two thousand years
have obscured our spiritual vision. It gives a plain
and unvarnished story of the origin of the Christian's
Bible. It is this: That once upon a time the world
was ruled by a triune composed of Brahma and Buddha
and one Looeamong; that the devil, entering into the
presence of Looeamong, tempted him by showing
the great power of Buddha and Brahma, and induced
him (Looeamong) to take upon himself the name
Kriste, so that it came to pass that the followers of
Kriste were called Kristeyans; that Looeamong or
Kriste, through his commanding general, Gabriel,
captured the opposing gods, together with their entire
command of 7,600,000 angels and cast them into hell,
where there were already more than 10,000,000 who were
in chaos and madness. This Kriste afterward assembled
a number of his men to adopt a Code. At this meeting
it is said there were produced "two thousand, two
hundred and thirty-one books and legendary tales of
gods and saviors and great men," etc. This council
was in session four years and seven months, "and at
the end of that time there had been selected and com-
bined much that was good and great, and worded so
as to be well remembered of mortals." Plaintiff's
Exhibit A, page 733, verse 55. The council, or "con-
vention," as it would now be termed, having adopted
a platform,—that is, agreed upon a Bible—then pro-
ceeded to ballot for a god. "As yet no god had been
selected by the council, and so they balloted in order
to determine that matter." Plaintiff's Exhibit A, page
733, verse 36. On that first ballot the record informs
us there were thirty-seven candidates, naming them.

This list includes the names of such well known personages as Vulcan, Jupiter, Minerva. Kriste stood twenty-second on this ballot. "Besides these, there were twenty-two other gods and goddesses who received a small number of votes each." Plaintiff's Exhibit A, page 733, verse 37. The names of these candidates are not given, and, therefore, there is nothing in the record to support the contention of the counsel that the list includes the names of Bob Ingersoll and Phoebe Coussins. The record tells us that at the end of seven days' balloting "the number of gods was reduced to twenty-seven." And so the convention or council remained in session "for one year and five months, the balloting lasted, and at the end of that time the ballot rested nearly equal on five gods, namely, Jove, Kriste, Mars, Crite, and Siva;" and thus the balloting stood for seven weeks. At this point Hataus, who was the chief spokesman for Kriste, proposed to leave the matter of a selection to the angels. The convention, worn out with speech making and balloting, readily accepted this plan. Kriste, who, under his former name of Looeamong, still retained command of the angels (for he had prudently declined to surrender one position until he had been elected to the other), together with his hosts, gave a sign in fire of a cross smeared with blood; whereupon he was declared elected, and on motion his selection was made unanimous. Plaintiff's Exhibit A, page 733. We think this part of the exhibit ought to have been excluded from the jury, because it is an attack in a collateral way on the title of this man Looeamong, who is not a party to this proceeding, showing that he had not only packed the convention (council) with his friends, but had surrounded the place of meeting with his hosts, "a thousand angels deep on every side," thus violating that principle of our laws which forbids the use of troops at the polls.

After thus endeavoring to demonstrate that Christianity had its origin in fraud, and thus to prepare the minds of its disciples for the new gospel, the Oahspe proceeds to unfold the beauties and the simplicity of the new faith. Passing over many interesting features contained in this exhibit, such as the birth of Confucius, the rise and fall of Mohammedanism, the discovery of America by Columbus, etc., the record brings us to the discovery and settlement of the Land of Shalam, which forms the subject of this controversy. As already seen, the record shows that a tract of land in the county of Dona Ana was selected. This was bought and paid for by the appellant Howland, and conveyed in trust for the use of the society. Among other conditions attached to the trust, one was to the effect that "no meat, nor fish, nor butter, nor eggs, nor cheese, nor any animal food, save honey, shall ever be used upon any part of the premises, except that milk may be given to children under five years old." Transcript of Record, page 167. It is admitted that this, among many other conditions of the trust, was violated; so that on the thirteenth day of March, 1886, the trustees, among whom was the appellee, made a reconveyance of the property to the said Howland. There are many other interesting features presented by this record. Much proof was taken as to the conduct of the society or community which was incorporated under the name and style of the "First Church of the Tae." Record, page 180. They organized also a general cooperative system; established what they called the "Faithist Country Store" (Record, page 87)—an institution, as we are advised, that did well as long as it kept on hand a good stock of faith. There was an outer and an inner council, and contributions were received, to be devoted to the care and education of orphan children. It was charged in the declaration that the members did not

practice that degree of morality which was set forth in their circular, and proof was introduced with a view to show the questionable relations existing between one of the promoters of the scheme and one Miss Vandewater, alias Miss Sweet; but as the plaintiff remained on the premises eighteen months, and as he assigned no such reason for leaving (page 88), and as he made no demand at the time for compensation for work and labor done, nor for his injured sense of morality, we think this is an afterthought. This society of Faithists, while communistic in theory, agrarian in habits, and vegetarian in diet, was not altogether void of sentimentality nor indifferent to the Muses. One of the fair members of the society, inspired by the poetic surroundings of this fair Land of Shalam, composed some beautiful lines that are incorporated into the record on page 62. They are as follows:

> "For all things are held in common,
>         Hooray! Hooray!
> Thus everything belongs to all,
> And peace abounds in Shalam;
> Away, away, away out west in Shalam!"

The authoress of these beautiful and touching lines is Nellie Jones, a member of the society. She is not made a party to this action, however, and, therefore, no judgment can be rendered against her. The lines were, by direction of one of appellants, Dr. Newbrough, sung to the air of Dixie. We can not give our assent, however, to the views of the able counsel for the appellee that causing these lines to be sung to the air or "tune of Dixie" was of itself such an act of disloyalty as to entitle the plaintiff to a verdict. The writer of this opinion, like the appellee, is himself a native of the land of Dixie, that

> "Fair land of flowers,
> And flowery land of the fair."

—And, as he reads these lines of Nellie Jones, memory carries him back to the days of his boyhood, and

to the land of the "magnolia and the mocking bird."

O, glorious Land of Shalam! O, beautiful Church of Tae! When the appellants, the appellee, Ada Sweet, and Nellie Jones, aforesaid, formed their inner circle, and like the morning stars sang together, it matters not whether they kept step to the martial strains of Dixie, or declined their voices to the softer melody of Little Annie Rooney, the appellee became forever estopped from setting up a claim for work and labor done; nor can he be heard to say that "he has suffered great anguish of mind in consequence of the dishonor and humiliation brought on himself and children by reason of his connection with said defendants' community." His joining in the exercises aforesaid constitutes a clear case of estoppel in Tae.

<span style="float:left">ESTOPPEL.</span>

There is another reason, however, why this act of disloyalty on the part of the appellants should not prejudice them; and that is that the plaintiff himself joined in the chorus when the "tune of Dixie" was sung. On page 109 of the record appears the following, the plaintiff himself being upon the witness stand: "Question. You all sang this with a good deal of lustiness? Answer. No, sir; we sang it to the tune of Dixie. Q. All joined in the chorus? A. Yes, sir; all that could." Pretermitting any expression of opinion as to whether it would, under any circumstances, be competent to allege and prove in this court that the ode to Shalam had been sung to the tune of Dixie, it is in proof, as we have seen, that the parties were in pari delicto, and, therefore, neither can avail himself of the other's wrong.

It is insisted, however, that the appellee was deceived by the appellants; that they did not carry out the purposes set forth in their circular and manifestoes; and that they did not live up to the doctrines contained in their Bible. The plaintiff admits that he had read their books thoroughly before he joined them. He belonged to the inner circle; was one

<span style="float:left">DECEIT.</span>

of the trustees; joined in the worship; sang in the choir; and listened to the soul-enrapturing voice of Nellie Jones. Moreover, he had entered into the Holy Covenant. That covenant is found in chapter 5 of the Book of Jehovih's Kingdom on Earth. Plaintiff's Exhibit A, page 833. The twenty-fourth verse of the covenant is as follows: "I covenant unto Thee, Jehovih, that, since all things are thine, I will not own nor possess, exclusively unto myself, anything under the sun, which may be intrusted to me, which any other person or persons may covet or desire, or stand in need of." Under the terms of this covenant, he can not maintain his suit, for the defendants insist, and the proof is clear, that they "covet or desire or stand in need of" the $10,000 for which the plaintiff sues. This is a complete answer to so much of plaintiff's cause of action as is laid in assumpsit, just as his participation in the church exercises, music, etc., was an estoppel to his right to set up "anguish of mind" and ruined reputation and other matters founded in tort.

It is insisted, however, that the appellee has a right to recover for a deceit practiced upon him; that he was misled by the Oahspe and other writings of the society. On the contrary, the defendants maintain that the appellee is a man who can read, and who has ordinary intelligence, and this the appellee admits. This admission precludes any inquiry as to whether appellee's connection with the Faithists, their inner and outer circles, their music and other mystic ceremonies, their general warehouse and cooperative store, and other communistic theories and practices, gave evidence of such imbecility as would entitle him to maintain the suit. Admitting, therefore, that the appellee was a man of ordinary intelligence, we find nothing in the exhibits which in our opinion was calculated to mislead him. True, the Oahspe, like other inspired writings, such as the Koran, Bunyan's Pilgrim's Progress, and other

works of like character, deals largely in figures and tropes and allegories. But, read in the light of modern sciences, they are beautiful in their very simplicity. We would be glad to embody the whole of plaintiff's Exhibit A, but must confine ourself to such citations as will, in our opinion, be sufficient to sustain this view. A careful examination of appellee's Exhibit A, the New Bible of Oahspe, leads us to the inevitable conclusion that its splendid exhibitions of word painting were not confined to the Mesilla valley, although it is in proof, and, indeed, is not denied, that a much larger volume might be written, and yet not exhaust the subject of that valley's many attractions. But, while there are many descriptive features in the record that unquestionably apply to the section in controversy, there are others that bear on their face a very different application. As a specimen of the former, we cite the following, found on page 370 of the Exhibit A: "Next south lay the kingdom of Himalawowoaganapapa, rich in legends of the people who lived here before the flood; a kingdom of seventy cities and six great canals, coursing east and west, and north and south, from the Ghiee mountain in the east, to the West mountain, the Yublahahcolaesavaganawakka, the place of the king of bears, the EEughehabakax (grizzly). And to the south, to the middle kingdom, on the deserts of Geobiathhaganeganewohwoh, where the rivers empty not into the sea, but sink into the sand, the Sonogallakaxkax, creating prickly Thuazhoogallakhoomma, shaped like a pear." As an illustration of that portion of the exhibit which, in our opinion, was not designed as a description of the Land of Shalam, we cite the following, found on the same page of the exhibit. "In the high north lay the kingdom of Olegalla, the land of giants, the place of yellow rocks and high spouting waters. Olegalla it was who gave away his kingdom, the great city of Powafuchswowitchahavagganeabba,

with the four and twenty tributary cities spread along the valley of Anemoosagoochakakfuela. Gave his kingdom to his queen, Minneganewashaka, with the yellow hair, long hanging down." This unquestionably refers to Chicago. The author, after giving a general description of many lands and cities, leads his "deciples" to some high point, most probably Sierra Blanca (from whose snow-covered summit the summer breezes fall like a gentle cascade over the valley of the Pecos), and spreads out before them a vast system of irrigation. The following is taken from the record, and will be found commencing on page 369 of appellee's Exhibit A: "Beside the canals mentioned, there were seven other great canals, named after the kings who built them, and they extended across the plains in many directions, but chiefly east and west." Speaking of the vast canals that formed a network of the beautiful valley, the record says: "Betwixt the great kings and their great capitals were a thousand canals, crossing the country in every way, from east to west and from north to south, so that the seas of the north were connected with the seas of the south. In kanoos the people traveled, and carried the productions of the land in every way."

We are of the opinion that a proper cause of action was not set out in the declaration, and that there was no evidence to sustain the verdict of the jury awarding the plaintiff $1,500; that the refusal of the trial judge to set aside the verdict was error; and, therefore, the judgment of the district court should be reversed.

O'BRIEN, C. J., and LEE and SEEDS, JJ., concur in the result.

McFIE, J., being of counsel in the case below, took no part in the consideration of this case.