MOTHER EARTH, LTD., *et al.*, Plaintiffs and Counterdefendants-Appellants, *v.* STRAWBERRY CAMEL, LTD., *et al.*, Defendants and Counterplaintiffs-Appellees.

First District (1st Division)    Nos. 77-1177, 78-314 cons.

Opinion filed May 7, 1979.

Rabens, Formusa & Glassman and Porcelli and Jorgenson, both of Chicago (George C. Rabens, of counsel), for appellants.

Anthony J. Pauletto, of Chicago, for appellees.

*Mr. JUSTICE BUCKLEY delivered the opinion of the court:

Although the protagonists that have lent their names to this cause bear fanciful designations and are imaginary creatures that sprang forth from Illinois law, the issues presented in this court are of a somber character, being based on allegations of fraud, and although decisional authority in this State on the subject of fraud has at times a Wonderland aspect, resolution of these issues is a serious matter not only for the parties to this cause, but also for all those who would look to this court's decisions for their precedential impact.

At the heart of this consolidated appeal is an agreement under which a tavern-nightclub business was conveyed by Strawberry Camel, Ltd., to

---

* This opinion was prepared by Justice Buckley while assigned to the Illinois Appellate Court, First District.

Mother Earth, Ltd., on January 15, 1974. In the form in which it appears before this court, however, this appeal does not concern an action in contract, but rather one action sounding in tort and another in equity. The former, filed by Mother Earth, is known by various names and is probably most properly labeled an action on the case for deceit, in which the remedy of money damages is sought. The latter, a countercomplaint filed by Strawberry Camel, seeks an equitable remedy due to Mother Earth's default on payments under the sale agreement, and is defended against by Mother Earth on the grounds that the underlying agreement was procured through misrepresentations.

Mother Earth's complaint and its defense to Strawberry Camel's countercomplaint involve a common element, which may advisedly be referred to as an allegation of fraud. In the circuit court of Cook County, law division Judge George A. Higgins entered a directed verdict for Strawberry Camel on Mother Earth's complaint and chancery division Judge Joseph M. Wosik entered summary judgment for Strawberry Camel on its countercomplaint.

Because we believe that Mother Earth's evidence in the circuit court regarding alleged fraudulent conduct was sufficient to go to the jury and because we regard the question of whether such fraudulent conduct occurred as crucial to Mother Earth's defense to Strawberry Camel's countercomplaint, both judgments are reversed and the causes are remanded.

On July 25, 1975, a two-count complaint was filed by Mother Earth and its principals, Rocco Dodaro and Clarence Herman. Eileen Dodaro and Donnalee Herman, wives of the corporation's principals, were also named as plaintiffs. In count I, plaintiffs sought rescission of the agreement under which Mother Earth acquired a nightclub business from Strawberry Camel, which had acted through its principal, Dale Yates. Also sought was an injunction to prevent Strawberry Camel, Yates, and the LaSalle National Bank from enforcing any of the security agreements executed in connection with the sale. In count II, plaintiffs prayed for $70,000 in damages due to alleged misrepresentations made by Yates which allegedly were instrumental in effecting the sale. Plaintiffs filed a jury demand.

Subsequently, plaintiffs dismissed count I of their complaint and defendants Strawberry Camel and Yates filed a countercomplaint for injunctive and other relief. The injunctive relief was sought against the First National Bank of Schiller Park to prevent it from enforcing a security agreement between it and Yates. The other relief sought was sale of the beneficial interests in two trusts assigned to Yates by the Herman and Dodaro couples as security for the sale transaction. The power of

direction of these trusts was, by terms of the assignment vested jointly in Yates and the assigning couple. The subject matter of each trust was real estate owned jointly by each couple.

Mother Earth's complaint was tried before a jury in the law division, but at the close of plaintiffs' case a verdict was directed for defendants. In the course of plaintiffs' case, the following evidence was produced:

Beginning in March 1973, Strawberry Camel, an Illinois corporation owned by Yates, operated a nightclub on premises at 4242 Old River Road, Schiller Park, which were leased from Jean Karbowski. In late November 1973, Yates advertised the business for sale and Clarence Herman and Rocco Dodaro responded to the advertisement. Yates told them he would sell the business for $65,000. Sometime later the three met in a coffee shop to discuss the matter further.

Dodaro testified that, at that meeting, Yates informed them that they could expect to carry their earnings from the business away in pillowcases, and that he had made enough money from it to buy a ski lodge in Colorado. According to Dodaro, Yates demonstrated for them what gross income from a typical week had been while the business was operated by Strawberry Camel. He did this by writing figures representing each day's income on the back of waitresses' meal checks. These checks were entered into evidence and contained columns of figures coupled with names of days of the week plus calculations of the weekly and monthly rates of income that would result from such daily figures. The monthly total was more than $19,000, and Dodaro testified that Yates told them the business income for 1973 had been about $20,000 per month, with expenses averaging around $10,000.

Clarence Herman, who is blind, confirmed the story told by Dodaro with respect to the oral statements and circumstances. It was stipulated by the parties that some of the handwriting on the waitresses' checks was that of Yates.

Donald Yates, called by plaintiffs as an adverse witness pursuant to section 60 of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 60), confirmed that there had been such a coffee shop meeting and that he had written some of the figures on the waitresses' checks in question. He denied that he had told Herman and Dodaro that the business had had an average monthly income of $20,000 under his ownership. When asked to estimate what his income had actually been during a typical week in 1973, Yates listed figures that would have resulted in an average monthly income of more than $16,000.

The income tax return for Strawberry Camel filed by Yates for 1973 was admitted into evidence. It listed income of $119,312.82. Yates testified that he operated the business from March onward during that year. Yates' testimony that monthly expenses for operating the business averaged

$10,000 in 1973 was not contradicted and Dodaro's testimony indicated that business expenses during Mother Earth's subsequent operation of the nightclub were approximately $10,000.

Herman and Dodaro testified that they asked Yates to see records to confirm his version of the business' earnings, but that Yates told them his books were unavailable because they were being used for tax purposes. They stated that they believed Yates' statements and in reliance on them eventually contracted to buy the business for $59,000.

In order to facilitate the sale, Yates had his own attorney, John Summerfield, assist Herman and Dodaro in incorporating as Mother Earth, Ltd., and had Summerfield draw up not only a contract of sale, but also trust agreements and other documents by which the Herman and Dodaro couples placed their homes under trusts and assigned the beneficial interests in those trusts to Yates as security for performance of their obligations under the contract of sale to pay Yates $1,000 per month. One of the additional documents, captioned "SECURITY AGREE-MENT—(Chattel Mortgage)," provided that Yates would have a security interest in or mortgage on the beneficial interests in the trusts with respect to the Hermans' and Dodaros' homes. It further provided, "In the event that the First National Bank of Schiller Park declines to renew Dale Yates' note, the obligation of debtor to the secured party shall be in the amount of $1,000.00 (One thousand dollars) per month until the obligation is retired." The indebtedness was listed as $56,485. In addition, it stated that a "[c]opy of note is attached hereto," and, "Payments on this and subsequent renewal notes which are to be made to the First National Bank of Schiller Park shall be made by the Debtors to Dale Yates and by Dale Yates in turn to the First National Bank of Schiller Park. Dale Yates assumes the responsibility of having the notes renewed from time to time as has been the practice since the origination of the obligation." A note appears in the record as an attachment to plaintiffs' complaint under which Yates promised to pay $56,485.16 to the First National Bank of Schiller Park within 180 days. No such note was appended to the countercomplaint, but a document supplied as part of a bill of particulars, which was styled as a "Closing Statement," contains a line entry for a "Note to be assumed" in the amount of $56,485.16. The other documents prepared by Summerfield were assignments by which the Herman and Dodaro couples assigned the beneficial interests in the trusts covering their homes to Yates simply "as a collateral assignment," and which provided that "the power of direction shall vest jointly in Dale Yates and" each assigning couple.

At Summerfield's suggestion, Herman and Dodaro looked for an attorney to represent them at the closing. They found John Crittenden,

who accepted the documents for examination and accompanied them to the closing. At the closing, Summerfield called Crittenden into his office and the two attorneys held a discussion without their clients, then called their clients in for signing the documents.

Dodaro and Herman testified that they were unaware that the contract contained an express disclaimer of any warranties not stated within the contract, but that they understood that the security agreements would remain in Crittenden's hands until they were satisfied that the business had been delivered in the condition promised. When they called Crittenden to remind him not to give up these documents until they were satisfied with the business, however, Crittenden told them he had already given the documents to Summerfield. Dodaro stated that they never paid any money to Crittenden and have subsequently been unable to locate him and now doubt that he was actually an attorney.

The purchase agreement, which was signed January 15, 1974, provided in part for assignment of the lease to the premises, and in an attached bill of sale as well as in the agreement itself, for transfer of three cash registers, a beer cooler and compressor, ice machines, light fixtures, two blenders, tables, chairs and stools "as on premises" and "cooking equipment in rear of building as on premises."

On January 17, 1974, the lessor, Jean Karbowski, consented to assignment of the lease and Mother Earth subsequently took possession. Yates was paid to work with Dodaro and Herman, but the business was operating at a loss, and Dodaro and Herman offered to cancel the sale. Yates assured them that the lag in business was seasonal, but refused to cancel the deal. After five or six weeks there was no money available to pay Yates' salary, so he left.

Herman and Dodaro borrowed money to keep the business going, then tried to operate it through management contract, and eventually tried to sell it. However, Karbowski informed them that the cash register, beer cooler and compressor, ice machine, tables, chairs, stools, bars, bar equipment and the cooking equipment in the rear of the building were hers. At trial plaintiffs made an offer of proof that a buyer had been interested in the business at a price of $25,000 until he learned that Karbowski was claiming these items, and that he then reduced his offer to $5,000.

A letter from Jean Karbowski in which she claimed ownership of these items was admitted into evidence and her son, Richard, testified as to her ownership of them. A lease was admitted into evidence under which Jean Karbowski leased the subject premises to Addison Lumber & Construction Co., article 13 of which was captioned in type as a "Sale of Business," but recaptioned in handwriting with initials as a "Lease of Business," and listed as leased the items claimed by Karbowski as her

own. Addison Lumber in turn assigned the lease to others, and it was eventually assigned to Strawberry Camel, and by Strawberry Camel to Mother Earth.

Yates testified that the items in question were his to convey and produced a release signed by Jean Karbowski which waived any liability under article 13 of the lease and acknowledged receipt from Yates of $4,000. Richard Karbowski maintained that the $4,000 represented payment of $5,000 for taking over the lease, less $1,000 for repair of an air conditioning unit.

The trial of the complaint was severed from that of the countercomplaint and proceedings with respect to the latter were stayed pending judgment on the complaint. At the close of plaintiffs' case on the complaint, Judge Higgins entered a directed verdict for defendants.

Although Judge Higgins did not make distinct findings of fact, he did provide a very thoughtful analysis of the facts, based on his commendable research on the applicable law, which is an invaluable aid in reviewing his action. The learned judge noted that plaintiffs' complaint stated a cause of action in tort for damages caused by misrepresentation and proceeded to evaluate the evidence presented in plaintiffs' case in light of decisional law.

He stated that the alleged representation of prior income was not actionable because it did not meet the requirement that the statement be one of existing fact, rather than prospective fact. He expressed the view that plaintiffs were remiss in failing to visit the nightclub to form an independent judgment as to its volume of business and that they should have been suspicious of any claim that a business that generated a profit of $100,000 per year could be purchased for $59,000. Additionally, he stated that the facts that plaintiffs did not take immediate action once they had reason to believe they had been defrauded, and that they had signed a contract with an express disclaimer of any additional warranties were factors to be considered, especially where plaintiffs were filing an affirmative action.

Regarding the items whose ownership was disputed, Judge Higgins stated that the release produced by Yates indicated Yates may have believed in good faith that they belonged to him, and that in any event these items were not of sufficient value to constitute an important or vital element in the sale.

The judgment on the directed verdict for Strawberry Camel was certified appealable pursuant to Supreme Court Rule 304 (Ill. Rev. Stat. 1975, ch. 110A, par. 304), and plaintiffs took an appeal.

In the chancery division, Strawberry Camel's motion for summary judgment on the countercomplaint for sale of the beneficial interests in the trusts was subsequently granted over Mother Earth's objections that

the court lacked jurisdiction due to the pending appeal, that material questions of fact regarding Yates' allegedly improper conduct relating to the contract remained, and that the pleadings were defective. An appeal was taken from that judgment, and the appeals were consolidated.

Both Mother Earth's complaint at law and its answer to Strawberry Camel's action in equity are related to the issue of fraud. Although, as the following discussion will demonstrate, great care is necessary in transferring principles of law relating to fraud to actions in equity and *vice versa*, there is sufficient similarity in these two issues to require that consideration of the defense in equity be postponed until the merits of the action at law are discussed.

In the law division it was correctly recognized that Mother Earth's complaint stated a cause of action in tort for damages caused by a fraudulent representation. However, as one legal scholar states of this area of the law:

"There has been a good deal of overlapping of theories, and no little confusion, which has been increased by the indiscriminate use of the word 'fraud', a term so vague that it requires definition in nearly every case. Further difficulty has been added by a failure to distinguish the requisites of the action in tort at law from those of equitable remedies, and to distinguish the different forms of misrepresentation from one another, and misrepresentation itself from mere mistake. Any attempt to bring order out of the resulting chaos must be at best a tentative one, with the qualification that many courts do not agree." (W. Prosser, The Law of Torts, 684-85 (4th ed. 1971). See Green, *Deceit*, 16 Va. L. Rev. 749 (1930).)

We regard the observations in the law division concerning the significance of the alleged misrepresentation as to ownership of equipment, plaintiffs' failure to file their law action immediately, and plaintiffs' possible credulity as indicating that the "attempt to bring order out of the resulting chaos" was unsuccessful, and we find it necessary to make our own attempt.

The roots of the cause of action stated by Mother Earth's complaint may be traced to the writ of deceit, which existed as long ago as the year 1201. That writ, however, was applicable only where a legal procedure had been misused to the petitioner's detriment. Later this form of action was supplanted by an action on the case in the nature of deceit, which provided a remedy for actual damages caused by fraudulent and even nonfraudulent representations. Because of its unfailing link to contractual relations, it was not recognized as a distinct tort until *Pasley v. Freeman* (1789), 3 Term Rep. 51, 100 Eng. Rep. 450, in which damages were allowed where the misrepresentation was uttered by a third party. Meanwhile the remedy for breach of warranty had been subsumed by the

action of assumpsit in *Stuart v. Wilkins* (1778), 1 Dougl. 19, 99 Eng. Rep. 15. Thereafter, the two actions followed a generally divergent evolution, the distinction being that, in the tort action for deceit, knowledge or some equivalent of knowledge of the falsity of the statement is required as well as an intent to mislead, whereas the contract action on a warranty has no such requirements. Prosser, at 685.

The word "fraud" has been adopted by the courts in Illinois as descriptive of the kind of conduct that will support such a cause of action. That word, however, has also been used to describe the kind of conduct that will support other causes of action, some of which may also be supported by other kinds of conduct. An equitable action for rescission, for example, may be based on fraud, mutual mistake, or even in certain cases unilateral mistake (See, *e.g., Eisenberg v. Goldstein* (1963), 29 Ill. 2d 617; *John Calnan Co. v. Talsma Builders, Inc.* (1976), 40 Ill. App. 3d 62, *rev'd on other grounds*, 67 Ill. 2d 213; *Nelson v. Pedersen* (1922), 305 Ill. 606.) By cross-pollinating cases dealing with one cause of action based on fraud with principles drawn from other cases dealing with different causes of action based on fraud, the courts have obscured at times the distinct character of the underlying causes of action. It is useful to examine this process with emphasis on the tort action stated by Mother Earth's complaint.

Actions relating to fraudulent conduct were considered by the Illinois Supreme Court during its first few terms, but were analyzed under well-accepted principles without consideration of subtleties or potential confusion of causes of action. Thus, in *Bryan v. Primm* (1822), 1 Ill. (Breese) 59, the court merely observed that a *suppressio veri* was sufficient grounds to annul a contract; in *Sims v. Klein* (1829), 1 Ill. (Breese) 302, it was stated without reference to authority that fraud is fatal to a contract, but not every false statement amounts to fraud; in *McConnell v. Wilcox* (1837), 2 Ill. (1 Scam.) 344, *rev'd on other grounds*, 38 U.S. 498, the court noted that actual fraud is not presumed, and that the defendant's knowledge of a statement's falsity must be shown, citing a United States Supreme Court decision; and in *Kirkland v. Lott* (1839), 3 Ill. (2 Scam.) 13, it was held, without citation of authority, that in a defense to an action brought by payees of a note, it was fatal not to assert that the misrepresentation on which the defense was predicated was a knowing or fraudulent misrepresentation.

In the first decision dealing with what was recognized as an action on the case for deceit, *Weatherford v. Fishback* (1841), 4 Ill. (3 Scam.) 170, the court made two points of enduring significance. It stated without authority that deceit is the gravamen of such an action and *scienter* is its gist. It then noted that credulity of a buyer is no license for fraud by the seller, citing as authority the *Kirkland* decision. Accordingly, the court in

this single decision laid the foundation for tort actions in Illinois based on deceit and began mixing principles relating to that action with principles drawn for other causes of action.

In *Eames v. Fordham* (1865), 37 Ill. 260, the requirement of intent that the representation be relied upon was expressly adopted from *Pasley*; in *Bauman v. Bowles* (1869), 51 Ill. 380, it was emphasized that privity of contract is not a requirement for such a tort action, citing *Weatherford*; and in *Drew v. Beall* (1871), 62 Ill. 164, although the cause of action before the court was one in tort for deceit, the court relied on prior cases dealing with actions in warranty and in assumpsit in holding that the measure of damages would be the difference between the value of what the deceived person actually obtained and its value as represented. In that case the damages to the plaintiff were occasioned by his entering into a contract.

An effort to distinguish between fraud and failure of consideration was made in *Gage v. Lewis* (1872), 68 Ill. 604; and *Merwin v. Arbuckle* (1876), 81 Ill. 501, dealing with an action on the case for deceit, carefully set forth principles governing such actions relying only on cases dealing with such tort actions; but *Tone v. Wilson* (1876), 81 Ill. 529, dealing with rescission, borrowed indiscriminately from earlier Illinois decisions relating to actions in assumpsit as well as on the case for deceit.

The case of *Kenner v. Harding* (1877), 85 Ill. 264, established, relying entirely on authority from other jurisdictions, the principle that, although representations as to the value of an item are generally regarded as being of such a character that they cannot form the basis for a tort action for deceit, an exception is recognized where there is a conspiracy to defraud the plaintiff.

*Schwabacker v. Riddle* (1881), 99 Ill. 343, expands upon the nature of an action on the case for deceit, noting that the representation relied upon must be material and reliance on it reasonable, but citing no authority for these statements, and making other observations based on cases dealing with rescission and assumpsit, without expressly noting the varied nature of those cases. Primary reliance was placed on *Pasley* rather than *Weatherford,* when the court determined that benefit to the maker of the misrepresentation was not a requirement of the tort action for deceit in *Endsley v. Johns* (1887), 120 Ill. 469; and in *N.C. Antle & Bro. v. Sexton* (1891), 137 Ill. 410, although the court expressly recognized the case before it as an action on the case to recover damages from fraud and deceit, it applied principles from cases dealing not only with that tort, but also with actions in assumpsit and even for rescission, the latter relying in turn partially on Pomeroy's Equity Jurisprudence. For its most significant holding, that the existence of any written warranty or

disclaimer of warranty was not relevant, *Antle* placed primary reliance on treatises on tort law.

When an effort was made to list elements for the tort action of deceit in *Foster v. Oberreich* (1907), 230 Ill. 525, it was deemed best to rely on a New York decision, perhaps because of the confusion that had already crept into Illinois decisions in this area; similarly, in listing the elements necessary for rescission, Illinois decisions were ignored in favor of Pomeroy's Equity Jurisprudence in *Prentice v. Crane* (1908), 234 Ill. 302. The elements of the two types of actions were then blended together in *Johnston v. Shockey* (1929), 335 Ill. 363, in a manner that is worth considering in some depth. In that decision the court expressly recognized the action before it as an "action of deceit" (335 Ill. 363), on appeal from a judgment on the pleadings entered in the municipal court of Chicago. The court noted that one induced to enter into a contract by fraud may rescind or he may affirm the contract and sue for damages. It then listed six elements for "[a]n action for fraud and deceit" (335 Ill. 363, 366), citing as authority two cases that dealt with equitable actions and which relied on Pomeroy and one case involving the tort action for deceit which contained no list of elements. *Foster* was not discussed for its list of elements for the cause of action, but rather was distinguished on the grounds that pleading requirements were more stringent in common law pleadings than in municipal court cases. Another case, *Bouxsein v. First National Bank* (1920), 292 Ill. 500, was distinguished because it dealt with a bill in chancery to set aside a contract, and was subject therefore to the rule that such pleadings must be as specific as for an action at law.

In view of this state of affairs, it is not surprising that, when the issue of whether a plaintiff's negligence could bar recovery where the defendant's misrepresentation was intentional arose in *Roda v. Berko* (1948), 401 Ill. 335, the court did not undertake a review of cases containing language regarding the reasonableness of plaintiff's reliance, but rather cited a single assumpsit decision as authority for a rule that lack of due diligence will not defeat such an action, and added the comment, without supporting authority, that this "is a well-settled rule, recognized both at law and in equity." (401 Ill. 335, 342.) *Roda* involved a complaint in equity for cancellation of a deed. In a similar vein is the court's statement in *Buttitta v. Lawrence* (1931), 346 Ill. 164, involving a tort action, that whether a given statement is actionable, as one of fact, or not, as one of opinion, depends on the circumstances of the case, a view which was echoed in *Bergman & Lefkow Insurance Agency v. Flash Cab Co.* (1969), 110 Ill. App. 2d 415, which concerned a counterclaim raising the issue of misrepresentation.

The foregoing discussion demonstrates that efforts to keep the tort

action for deceit distinct from related causes of action have been unsuccessful, and that the Illinois Supreme Court has from time to time simply overlooked confused decisional law and relied instead on outside authority or isolated, clear Illinois decisions. On the other hand, it also demonstrates that Illinois has been unswerving in its recognition that such a cause of action does exist and is distinct.

The area in which overlapping has most frequently occurred is in the enumerating of elements necessary to establish "fraud." As stated in a recent decision:

> "[A] misrepresentation to be the basis of a charge of fraud, either in a suit at law or in equity, must contain the following elements:
>
> (1) It must be a statement of material fact, as opposed to opinion;
> (2) it must be untrue;
> (3) the party making the statement must know or believe it to be untrue;
> (4) the person to whom the statement is made must believe and rely on it, and have a right to do so;
> (5) it must have been made for the purpose of inducing the other party to act; and
> (6) the reliance by the person to whom the statement is made must lead to his injury." *Broberg v. Mann* (1965), 66 Ill. App. 2d 134, 139.

Although the final element, resulting damages, appears unsuited to actions in equity, this list appears to be a reasonable offspring of Illinois decisions that persist in focusing on "fraud" as a common feature of various actions related to the tort action for deceit.

It does not differ substantially from the list in *Foster v. Oberreich*, the last Illinois decision to consider the question without lumping together, intentionally or unintentionally, authority stemming from related cases at law or in equity. We propose, therefore, to use this list as a framework for analysis, bearing in mind that care must be used in supplementing it in order to avoid inadvertently mixing causes of action, and also bearing in mind the example of the Illinois Supreme Court in looking to outside authorities where Illinois decisions prove inadequate.

■■ Examining under this framework the evidence presented in the law division, we note that it was found that a representation regarding income, such as that alleged in the present case, is not a statement of fact and therefore is not actionable. On this point, however, Illinois law is well settled, holding consistently that although representations of future income are not actionable, representations as to past income of a business constitute statements of fact (*Pustelniak v. Vilimas* (1933), 352 Ill. 270; *Noll v. Peterson* (1930), 338 Ill. 552; *Eisenberg v. Goldstein*). Even a

statement that a business is profitable may be actionable. (*O'Donnell & Duer Bavarian Brewing Co. v. Farrar* (1896), 163 Ill. 471.) The statements alleged to have been made in the present case included a specific representation of past income and a general representation that Yates had made enough money from the nightclub to buy a ski resort. Both of these statements were factual in nature, so that either could form a basis for Mother Earth's action.

The evidence that specific representations regarding income were made came from a number of sources. Dodaro and Herman both testified that they were made; the waitress checks that were entered into evidence supported their testimony, and Yates admitted that the basic figures on those checks were in his handwriting. Moreover, when called upon to estimate what actual income had been during the time Strawberry Camel operated the business, Yates offered figures that would total approximately the same as those Dodaro and Herman claim he stated to them.

We note that Judge Higgins did not express any view that plaintiff's evidence on this point was in any way unsatisfactory, and we find no deficiency in it.

As to the representation that certain equipment and furnishings belonged to Yates and were transferred under the purchase agreement, there was no question that this was a statement of fact, or that the evidence, which consisted of their mention in the purchase agreement, was in any way unsatisfactory. Rather, the trial court, expressed the view that, because their value appeared to be comparatively small, the representation regarding these items could not be regarded as material.

*Broberg* does require that a representation, to be actionable, must be material, but provides no definition of that term. *Foster v. Oberreich*, however, mentions no such requirement under that label, but in referring to its source authority, that decision does state that the representation must be "calculated and intended to influence the plaintiff." (230 Ill. 525, 527.) Other Illinois decisions that have shed light on the meaning of the term "material" have indicated consistently that it requires that the representation relate to a matter upon which the plaintiff could be expected to rely in determining to engage in the conduct in question (*McPherson v. Hewitt* (1975), 32 Ill. App. 3d 435, 443). It may not be an opinion (*Davis v. Nehf* (1973), 14 Ill. App. 3d 318), nor a promise of future action (*Polivka v. Worth Dairy, Inc.* (1974), 26 Ill. App. 3d 961). See *Rice v. Snarlin, Inc.* (1970), 131 Ill. App. 2d 434.

No decision relating to a tort action for deceit has come to our attention that held that there was a requirement that the representation relate to a matter of a particular magnitude in proportion to that upon which the plaintiff relied. On the contrary, it had been held that, even where the representation is of no direct relevance to the conduct induced, the representation may be actionable if the maker knew it was likely to be

an inducement (*Tone v. Halsey, Stuart & Co.* (1936), 286 Ill. App. 169; see 1 F. Harper and F. James, The Law of Torts 566-68 (1956).) It may be actionable even if the misrepresentation was not the sole inducement. *Hick v. Stevens* (1887), 121 Ill. 186.

Thus, although the relative magnitude of a misrepresentation may have relevance to other causes of action, it is of no importance in the present case.

■ Accordingly, a misrepresentation regarding ownership of equipment in a nightclub purchase would doubtless satisfy the requirement of materiality in inducing the purchasers to act, unless the value of the equipment in question were *de minimis*. There may be some issue regarding the amount of damages attributable to such a representation, but although in the present case the value of the items in question was not clearly established, the nature of the items suggests strongly that their value was of some consequence, so that any misrepresentation regarding ownership of them would meet the requirement of materiality because they certainly were capable of inducing payment of at least part of the purchase price for the nightclub business.

Proceeding to the second element of an action based on fraud, that the statement must be untrue, we note that there was evidence that both of the statements here in question were false. Regarding ownership of the equipment, the lease, Jean Karbowski's letter and her son's testimony were certainly sufficient to present a *prima facie* case of falsity of Strawberry Camel's claim to ownership. As for the representation regarding income, there is not only the circumstance that the business' income after change of owners was drastically lower than the amount represented as prior income, but also Strawberry Camel's tax return, which indicates a gross income of $119,312 for a period of operation of at least nine months, or an average income of at most $13,256 per month, which is far short of the $20,000 represented.

The third element requires that the maker of the statement in question know or believe it to be untrue. With regard to the representation of income, the tax return entered into evidence would establish a *prima facie* case with respect to this element, but as the trial court noted, there was no direct evidence that Yates knew the representation of ownership of the disputed equipment to be false. The absence of direct evidence on this point, however, is not necessarily fatal to a plaintiff's case, since knowledge of the defendant may be proved by means of circumstantial evidence. (*Duncan v. Dazey* (1925), 318 Ill. 500; *Carter v. Carter* (1918), 283 Ill. 324.) Such circumstantial evidence may justify an inference of knowledge that may stand unless rebutted. (*Broberg v. Mann.*) Such inferences are particularly apt where the matter in question is peculiarly within the range of facts known to the defendant.

(*Eisenberg v. Goldstein; Tate v. Jackson* (1959), 22 Ill. App. 2d 471.) Moreover, there are a number of decisions that have held that the requirement of *scienter* is met by a showing that the defendant knew he was unaware as to the truthfulness of the representation at the time he made it. *Majewski v. Gallina* (1959), 17 Ill. 2d 92; *Brennan v. Persselli* (1933), 353 Ill. 630; *Miller v. John* (1904), 208 Ill. 173; *cf. Tone v. Halsey*.

Yates' representation that Strawberry Camel owned the equipment in dispute related to facts peculiarly within his knowledge, and the circumstances of his ownership of the business and dealings with Jean Karbowski support an inference that he either knew he did not own such equipment or knew his ownership was doubtful. Yates did offer an explanation in rebuttal to this inference, saying that he thought the release he obtained from Jean Karbowski constituted a receipt for his purchase of those items. Because the language of that release does not expressly so provide and Jean Karbowski gave the release a contrary interpretation more compatible with that language, we believe that the credibility of Yates' explanation was a proper matter for the jury to determine.

The fourth element requires that plaintiffs believed and relied on the statement and had a right to do so. On this point the trial court expressed the view that the representation regarding business income was inherently implausible and that plaintiffs did not avail themselves of means to check its accuracy. It is true that certain statements are of such an improbable sort that one is not entitled to rely on them (*e.g., H. Hirschberg Optical Co. v. Michaelson* (Neb. 1901), 95 N.W. 461 (glasses will adapt to eyes); *Ellis v. Newbrough* (1891), 6 N.M. 181, 27 P. 490 ("Land of Shalom")), and that a person is not entitled to rely on a statement whose falsity would be apparent to anyone using ordinary prudence (*Bundesen v. Lewis* (1938), 368 Ill. 623; *Dickinson v. Dickinson* (1922), 305 Ill. 521; *Allen v. Hart* (1874), 72 Ill. 104).

In the present case, however, we do not regard it as proper to dismiss a representation, that a business that could be acquired for $60,000 investment had yielded a profit of $10,000 per month as inherently implausible. Although such a profit would represent an enormous return on a modest investment, the record provides no basis for a finding that such returns are unheard of in the nightclub business. Moreover, it is not difficult to imagine that such factors as promotional efforts and choice of entertainment could result in dramatic profits, and because the representation in question related to past income, it is not directly susceptible of interpretation as a promise that the same income would be realized under new, inexperienced owners.

As for plaintiffs' failure to take such steps as monitoring the business in order to test the accuracy of this statement, such efforts are not required, particularly where the person making the statement has

inhibited plaintiffs' inquiries by either lulling them into a feeling of false security or blocking their investigation. (*Keeshin v. Levin* (1975), 31 Ill. App. 3d 790; *Citizens Savings & Loan Association v. Fischer* (1966), 67 Ill. App. 2d 315; *Barnes v. Barnett* (1914), 188 Ill. App. 32.) In the present case Yates inhibited plaintiffs' inquiries by telling them that the business' books were unavailable.

■■ Moreover, even if plaintiffs were guilty of negligence in failing to insist on verification of Yates' statement regarding past income, the cause of action here presented is for an intentional tort, and it is well settled that an action for an intentional tort cannot be defeated by an assertion of negligence on the part of the plaintiff. (Prosser, at 716.) In the case of fraud this rule is stated to apply whether the action be at law or in equity. *Roda v. Berko; Peterson v. Yacktman* (1960), 25 Ill. App. 2d 208.

It is apparent that there is no evidentiary deficiency regarding the fifth and sixth elements specified in *Broberg*, that the statement be made for the purpose of inducing action on plaintiff's part and that the statement led to his injury.

The trial court judgment, however, was based in part on two additional factors: delay by plaintiffs in initiating the present action and their signing of a contract containing express disclaimers of any additional warranties. Although there exists at least one Illinois decision in which language occurs suggesting that laches could defeat an action at law for deceit (*Bulley & Andrews, Inc. v. Symons Corp.* (1975), 25 Ill. App. 3d 696), that language was mere dicta and we are confident that the doctrine of laches is applicable solely to bar affirmative actions in equity (*Ryan v. City of Chicago* (1974), 25 Ill. App. 3d 333; *Schmitt v. Wright* (1943), 317 Ill. App. 384) and has no application to bar a cause of action at law. If the trial court regarded plaintiffs' delay as having evidentiary significance, we are unable to see it as persuasive in undermining plaintiffs' case.

■■ Also, it is well established that the terms of any written contract executed in conjunction with fraud are irrelevent to a cause of action grounded not in contract but in tort. (*Pedalty v. George F. Nixon & Co.* (1937), 288 Ill. App. 294; *N.C. Antle & Bro. v. Sexton; Eisenberg v. Goldstein.*) Likewise, we see no particular evidentiary significance in plaintiffs' having signed a contract disclaiming any additional representations, when they have produced evidence that such representations were in fact made to them.

■■ In sum, we find no lack of evidence to support a *prima facie* cause of fraud, so that the directed verdict on plaintiffs' action in the law division was erroneous. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494.

■■ We note that, although the doctrine of election of remedies has long been held to bar the maintenance of both an action in tort for damages

and an action for rescission based on the same misrepresentation (*Johnson v. Shockey*), there is no such bar to maintaining an affirmative action at law for damages and defending against an action in equity based on the same misrepresentation, because, whereas obtaining remedies both at law and in equity is duplicative, there is no inconsistency in obtaining a remedy at law while preventing an adversary from obtaining a remedy in equity and thereby confining him to his remedies at law.

Indeed, the issue of unclean hands is not aimed at benefitting the party asserting it as a defense, but rather is for the protection of courts of equity in keeping with public policy and its application is within the discretion of the courts. (*Union Pacific R.R. Co. v. Chicago & Northwestern Ry. Co.* (N.D. Ill. 1964), 226 F. Supp. 400; *American University v. Wood* (1919), 216 Ill. App. 189, *aff'd* (1920), 294 Ill. 186.) Thus, a court of chancery will not aid a perpetration of a fraud. (*Brennan v. Persselli* (1932), 266 Ill. App. 441, *aff'd* (1933), 353 Ill. 630.) Moreover, equity will not aid any person who has done iniquity or is seeking to take advantage of his own wrong. *Diversey Corp. v. Charles Pfizer & Co.* (7th Cir. 1958), 255 F.2d 60; *Plenderleith v. Glos* (1928), 329 Ill. 382.

In raising the issues of breach of warranty and performance of contractual duties by Strawberry Camel, Mother Earth's answer called into question the right of Strawberry Camel to equitable relief. Accordingly, the granting of such relief could only be proper if it were found that these issues were without merit. Because determination of these issues depended on questions of fact reserved for jury determination in Mother Earth's action at law, our reversal of the judgment entered in the law division mandates that the summary judgment entered for Strawberry Camel without an evidentiary hearing in the chancery division must also be reversed.

Accordingly, both judgments of the circuit court are hereby reversed and remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

McGLOON and O'CONNOR, JJ., concur.