ALLEN L. GORDON *et al.*, Plaintiffs-Appellants, *v.* ALBERT H. DOLIN *et al.*,
Defendants-Appellees.

First District (4th Division)    No. 81-905

Opinion filed March 25, 1982.

Friedman & Koven, of Chicago (Robert J. Rubin and Kenneth Shepro, of counsel), for appellants.

Jann, Carroll, Sain & Dolin, Ltd., of Chicago (David A. Epstein, Gary A. Weintraub, and Joseph R. Steiger, of counsel), for appellees.

JUSTICE JIGANTI delivered the opinion of the court:

After a bench trial at which nine witnesses testified and 51 exhibits were received into evidence, the trial court made various findings of fact and conclusions of law which are here on appeal. Specifically, the court decided that the plaintiff-buyers, Allen L. Gordon and Hydrox Chemical Company, Inc. (Gordon), had failed to prove by clear and convincing evidence that there had been fraudulent misrepresentations by the defendant-sellers, Albert H. Dolin, Barry M. Dolin, and the Dolin Enterprises, Inc. (the Dolins). The court denied the various forms of relief prayed for by the plaintiffs including rescission of sale and purchase agreement, damages, and/or relief under the Illinois Consumer Fraud and Deceptive Business Practices Act. The trial court further held that the plaintiffs had failed to prove that the defendants had breached their warranties to the plaintiffs under the purchase agreement. On appeal, the plaintiffs contend that the trial court's findings of fact and conclusions of law are erroneous as a matter of law and that the trial court acted improperly when it denied them any form of relief.

These are some of the relevant facts concerning the four month negotiation period between Gordon and the Dolins eventuating in the purchase and sale of a small chemical company, Hydrox. In October 1978, Gordon, an experienced businessman, telephoned Barry Dolin, the president of Hydrox, to express his interest in the company. During the same month Gordon toured the Hydrox plant and also met with an accountant who showed him Hydrox's financial records.

According to Gordon's testimony, the defendants made a number of statements to him in the month of October. Barry Dolin told him over the telephone Hydrox produced hydrogen peroxide basically in two strengths, 3% and 6%; that it was a very stable business; that the Walgreen Company accounted for the majority of that business; that over the years the business had lacked sales emphasis and that is what the business needed; that he and his father wanted to sell the company; and that he would be happy to meet with Gordon toward this end.

When Gordon first visited Hydrox, he toured the office and then the plant. He testified that while touring, Barry Dolin told him that there were many uses for peroxide that had not been explored by Hydrox; that the company sold 3% and 6% concentrations of hydrogen peroxide; and that the majority of the business, some 65 to 70% was with the Walgreen Company. Barry Dolin also told him that "the relationship with Walgreen went back some 20 or 25 years; that Hydrox had been the sole supplier [to Walgreen] of this material in both 3% and 6% concentrations for some 20 or

25 years; that the relationship between the two was an excellent one; and that there was no reason for it not to continue." Gordon further testified that Barry Dolin told him when he first visited the plant that "under no circumstances" was he to contact Walgreen "or any other customer." The reason which Barry Dolin gave Gordon for not contacting Walgreen was that his father, Albert Dolin, had had a "very bad experience along these lines some year or two prior and, as a result, was very, very cautious about this kind of move." Gordon testified that he was shown a small freight elevator on this first visit and was told that the "elevator was not always in working condition, but that it was minor and * * * there was another elevator elsewhere on the premises which might be used." During his visit, Gordon was given a pamphlet on the end uses of hydrogen peroxide and also a list of equipment in the plant. Gordon admitted that Barry Dolin had told him that no contract existed between Hydrox and Walgreen and that there was no commitment on Walgreen's part to make purchases from Hydrox.

Barry Dolin's testimony concerning the telephone call with Gordon and Gordon's followup visit to the plant differed from Gordon's in the following respects. Barry Dolin said he told Gordon that Walgreen's business was between 60 and 70% of Hydrox' sales, rather than 65 and 70%. He said that he told Gordon the relationship with Walgreen was long standing. In regard to whether Gordon should contact Walgreen, Barry Dolin said he told Gordon that since Walgreen was a long standing customer it would benefit Gordon not to contact Walgreen because it would be better if Walgreen did not immediately know that there was a change in ownership. Barry Dolin also explained to Gordon that when he and his father had first purchased the business from the prior owner it was some three years before Walgreen knew of the change in ownership.

In November, Gordon met with Albert Dolin to get down to the details of purchasing the business. Gordon testified that in his first meeting with Albert Dolin, Dolin told him the business was a "gold mine"; that "if you just sat there and essentially did nothing you could make a good living from the business because the orders continued to come in largely from Walgreen;" that it was profitable; that it was a good business; and that Barry had done nothing to make the business grow. Gordon further testified that Albert Dolin told him that Hydrox had been the sole supplier to Walgreen for some 20 or 25 years; "that there was an excellent relationship there"; that there had been no problems of any kind and that the business was stable but geared to the growth of the Walgreen Company. Gordon also quoted Albert Dolin as saying that projected Hydrox figures for 1978 indicated that $50,000 to $55,000 could be taken out of the business. Gordon conceded that he had no intention of relying entirely on the Walgreen account.

Albert Dolin's testimony concerning his first meeting with Gordon conflicted with Gordon's testimony. Albert said that he initially expressed his reluctance to sell the business to Gordon and emphasized that the business needed a real sales effort and a good deal of work and "without that which it requires, it would not be great." Albert further testified that he did not tell Gordon that the business was a "gold mine or words to that effect." Albert stated that he might have said Walgreen was an important customer, but that he mentioned other drug companies who were also important customers. Albert said that he had not told Gordon that $55,000 could be drawn out of the business in 1978.

Also in November, Gordon toured the Hydrox plant for a second time, this time with his wife. He then met with the Dolins to discuss arrangements for a sale. At this meeting, Albert Dolin said he told Gordon that the relationship between Hydrox and Walgreen was a "long term relationship." He denied ever characterizing the relationship as a "good relationship." Gordon and the Dolins met twice more in November and a sales price was agreed upon. On November 30, 1978, Gordon's attorney prepared the first draft of a proposed agreement for the purchase and sale of Hydrox' assets. Albert Dolin was sent a copy of this first draft and he made some changes in it. Specifically, Albert changed the term "notice" to "actual notice" to the sellers of a customer's intention to reduce or discontinue business. Only with this change would the Dolins agree to warranty to Gordon that there had been no change in such relationships. Albert testified that he made this change because he wanted the agreement to be "clear, unambiguous, and precise" as it related to the reduction in business or loss of customers.

On December 15, 1978, approximately 2½ months after Gordon first contacted Barry Dolin by telephone, Albert Dolin met with Gordon's attorney to discuss contract terms and closing dates. A December 28 closing date was first suggested by Gordon, but Albert Dolin requested that the closing be delayed until January 16, 1979, to accommodate his vacation plans. At this meeting, a number of refinements in relation to the agreement were worked out, including discussions regarding the handling of the accounts receivable. In particular, Albert Dolin requested that the receivables be paid to Gordon who would then remit them to the Dolins. Such a procedure would render it unnecessary to contact all of Hydrox's customers and inform them that the business had changed management. On December 27, Gordon and his wife met with the Dolins. This time both sides were represented by counsel. Gordon mentioned once more in December that he wanted to visit Walgreen to discuss the Hydrox account, but Albert Dolin testified that he again discouraged Gordon from doing so. The purchase agreement was finally signed on December 28,

1979. Relevant portions of the purchase agreement will be discussed later in this opinion.

The closing was held on January 16, 1979. The procedure took several hours and at one point the deal nearly fell apart because Albert Dolin would not sign until Gordon agreed to indemnify the Dolins as to liability to the landlord for the unexpired lease. Gordon finally agreed and the deal was consummated. Under a contemporaneous oral agreement, Barry Dolin agreed to stay on at Hydrox for a few months as a consultant.

Factual events which transpired between Walgreen and Hydrox while Gordon was negotiating for the purchase of the business are also relevant to this appeal. These events are categorized here according to the month in which they took place so that they can more easily be keyed to the progress of the four-month negotiation period. On October 4, 1978, the day before Gordon's first visit to Hydrox, Walgreen placed an order with the company for approximately 100,000 bottles of hydrogen peroxide. This order related to a Walgreen's promotion schedule for January or February, 1979. Hydrox billed Walgreen approximately $51,291.60 for this order during the period under consideration.

There were a number of events in November between Walgreen and Hydrox which correspond roughly to Gordon's second visit to Hydrox and his first two meetings with the Dolins. On more than one occasion, Barry Dolin told Walgreen about the difficulties he was having in filling their orders. These problems included the dysfunctioning of the small freight elevator and the labeling machine and also difficulties encountered in procuring enough water to manufacture the chemical and enough empty bottles to fill with the chemical. On November 29, Walgreen requested a return of their "art work" for printing labels. Barry Dolin admitted that this was the first time Walgreen had ever requested a return of the "art work." However, a Walgreen's agent testified at trial that he had told Barry Dolin that Walgreen was going to make some art work changes pursuant to a new Walgreen policy of requesting the return of its "art work" from suppliers. On November 30, the same day that Gordon's attorney prepared a draft of the purchase agreement and sent it to Albert Dolin, the Dolins visited Walgreen in Deerfield and returned the "art work." Testimony relating to this meeting between the Dolins and Walgreen indicate that the Dolins discussed some of their problems relating to delivery and that Albert Dolin stated that Hydrox was a "long term supplier to Walgreen and that they had been doing business for many years," but nothing further was said about the return of the "art work" and nothing at all was said about the status of the relationship between Hydrox and Walgreen.

Various events between Hydrox and Walgreen also took place in

December which correspond roughly to the completion of negotiations concerning the purchase agreement and the setting of a closing date. On December 4, Walgreen sent Hydrox a "Continuing Labeling Agreement." On December 5, a Walgreen representative visited Hydrox and toured the plant—something which Barry Dolin admitted had never happened before. On or before December 19, nine days prior to the closing date originally suggested by Gordon but delayed by Albert Dolin because of his vacation plans, Walgreen made an internal decision to shift part of its hydrogen peroxide business to a new supplier and on December 19 sent the "art work" to the new supplier. A Walgreen agent testified that the Dolins were not advised of this occurrence. Even with its change of policy, Walgreen placed 11 new orders with Hydrox in December which resulted in billings of approximately $31,159.62.

On January 22, 1979, six days after the closing, Gordon contacted Walgreen for the first time and was advised that Walgreen would be "splitting" their business with another supplier and approximately "50% to 60%" of the business would be transferred. Then on February 14, 1979, almost one month after closing, Walgreen placed another new order with Hydrox and the next day, February 15, Gordon filed his complaint.

Gordon first alleges that he was defrauded by the Dolins. He contends that the statements made to him concerning the status of Hydrox' relationship with Walgreen and the serviceable condition and repair of the equipment were material and untrue.

The law is well settled in Illinois that to prevail in a cause of action for fraud, a heavy responsibility is placed upon the party asserting the fraud. This party must prove: (1) that the defendant made a statement, (2) of a material nature as opposed to opinion, (3) untrue, (4) known by the person making it to be untrue, believed by him to be untrue, or made in culpable ignorance of its truth or falsity, (5) relied upon by the victim to his detriment, (6) made for the purpose of inducing reliance, and (7) such that the victim's reliance led to his injury. (*Oltmer v. Zamora* (1981), 94 Ill. App. 3d 651, 418 N.E.2d 506; *Mother Earth, Ltd. v. Strawberry Camel, Ltd.* (1979), 72 Ill. App. 3d 37, 390 N.E.2d 393; *Broberg v. Mann* (1965), 66 Ill. App. 2d 134, 213 N.E.2d 89.) The plaintiff must further prove the first four elements by clear and convincing evidence direct or circumstantial. (*Oltmer v. Zamora* (1981), 94 Ill. App. 3d 651; 418 N.E.2d 506; *Racine Fuel Co. v. Rawlins* (1941), 377 Ill. 375, 36 N.E.2d 710.) Whether or not the plaintiff has adequately proved these elements is a question of fact for the finder of fact. *Oltmer v. Zamora* (1981), 94 Ill. App. 3d 651, 418 N.E.2d 506.

Our task is to review the evidence and decide if it is sufficient to support a verdict for the defendants. The defendants claim that they made no untrue statements to Gordon concerning the relationship be-

tween Hydrox and Walgreen about the condition of the equipment. To recover a verdict for fraud, a plaintiff must first and foremost satisfy the trier of fact that a material untrue statement was in fact made by the defendants to the plaintiff. (*International Nikoh Corp. v. H. K. Porter Co.* (7th Cir. 1966), 358 F.2d 284.) Such a threshold inquiry is required regardless of whether the plaintiff is claiming, as Gordon is here, that the misrepresentation was intentionally made, recklessly made and/or innocently made with culpability attaching to its truth or falsity. In all the cases cited to us by Gordon, as authority for his fraud claim, the court first dealt with this threshold question. *Mother Earth, Ltd. v. Strawberry Camel, Ltd.* (1979), 72 Ill. App. 3d 37, 390 N.E.2d 393 (intentional fraud, the court reversed a summary judgment and directed a verdict against the party claiming fraud because of possible *untrue statements* made by the plaintiff concerning past earnings of the business sold and ownership of the business equipment); *Roda v. Berko* (1948), 401 Ill. 335, 81 N.E.2d 912 (reckless fraud, the court reversed a dismissal of the complaint for failure to state a cause of action because it found the allegation that the buyer had made an *untrue statement* to the seller that he would use certain property for a factory while intending to use it for a junk yard legally sufficient); *Lyons v. Christ Episcopal Church* (1979), 71 Ill. App. 3d 257, 389 N.E.2d 623 (negligent fraud, the court held a realtor was not liable for the seller's *untrue statement* that the real estate was connected to a complete sanitary sewer system); *Giacomazzi v. Urban Search Corp.* (1980), 86 Ill. App. 3d 429, 407 N.E.2d 621 (innocent, but culpable misrepresentation, the court reversed a summary judgment because it found triable issues of fact as to the materiality of an *untrue statement* by the sellers of the exact amount of real estate taxes to be levied against the property).

In the instant cause, testimony concerning possible untrue statements by the defendants about the status of the relationship between Hydrox and Walgreen was conflicting. Gordon testified that Barry Dolin told him when he visited the plant for the first time that the relationship between Walgreen and Hydrox was an excellent one and that there was no reason for it not to continue. Gordon contends that these statements were misrepresentations because Walgreen was in the process of changing suppliers and Hydrox was having difficulty filling the Walgreen order of October 4. Barry Dolin does not admit he ever made these statements to Gordon. He testified that he told Gordon that the relationship was long standing. Gordon also testified that Albert Dolin told him at their first meeting that Hydrox had been the sole supplier to Walgreen for some 20 to 25 years; that the business was a "gold mine"; "that there was an excellent relationship there"; and "that there had been no problems of any kind." Gordon testified that on a subsequent occasion Albert Dolin again told him that the relationship with Walgreen was "excellent." Gordon

testified that Albert Dolin also had told him that $50,000 to $55,000 could be taken out of the business in 1978. Albert Dolin denied making all of these statements and testified that he told Gordon that the business needed a real sales effort.

■■ When testimony is conflicting as it is here concerning exactly what statements were made to the buyer by the sellers and the truth of such statements is challenged, the function of the trier of fact is to resolve these conflicts. (*Bailey v. Meador* (1980), 91 Ill. App. 3d 143, 414 N.E.2d 279.) The trial court concluded after hearing this testimony that Gordon failed to prove by clear and convincing evidence that the defendants made misrepresentations (intentional, reckless, negligent or culpably innocent) concerning the relationship between Walgreen and Hydrox. Because of the following evidence, we find the trial court's conclusion reasonable. Gordon claims that these untrue statements concerning the Walgreen-Hydrox relationship were made to him in October. In October, Walgreen placed a 100,000-bottle order with Hydrox. It was not until November that Barry Dolin started to have problems filling this order and that Walgreen requested the return of the art work. It was not until December that Walgreen adopted its policy to shift some of its business to a new supplier. Therefore, objectively speaking, the relationship between Walgreen and Hydrox looked promising in October. In addition, a Walgreen agent testified that the Dolins were never told of Walgreen's intention to shift business. Furthermore, Gordon admitted that Barry Dolin told him that no contract existed between Hydrox and Walgreen and that there was no commitment on Walgreen's part to make purchases from Hydrox. Also, Gordon admitted that he never had any intention of relying entirely on the Walgreen account.

Gordon also claims that the Dolins misrepresented to him that the equipment at Hydrox was in good operating condition. Specifically, he claims that on his first visit to Hydrox, Barry Dolin showed him the labeling machine, small freight elevator and water supply system and said they were in good condition. Gordon claims similar representations were made to him during the many negotiating sessions prior to the execution of the agreement and that the same representations were contained in section 2.6(e) of the purchase agreement, which warranted the equipment against "damage, destruction or loss" and in section 2.12, which states: "All tangible assets and properties of Seller are in good and serviceable condition and repair, and are in such condition as to permit the continued operation of the business of Seller after the closing without interruption." Gordon contends that immediately prior to closing, the water, freight elevator and labeling machine were not operative and that Barry Dolin admitted this was the case when he informed Walgreen in November of the difficulties he was having filling their orders.

Again, the finding of such misrepresentations is a question of fact for the finder of fact. The trial court concluded that the plaintiff had failed to prove a misrepresentation in regard to the equipment by clear and convincing evidence. The judgment of a trial judge sitting as trier of facts, who observed witnesses, heard testimony, viewed exhibits and made careful and complete findings of fact, will be affirmed on appeal if there is any evidence in the record to support the judgment. (*Brown v. Zimmerman* (1959), 18 Ill. 2d 94, 163 N.E.2d 518.) There is adequate evidence in the record to support the trial court's finding. Gordon himself, testified that Barry Dolin told him on his first visit to Hydrox that the freight elevator was not always in working condition. Furthermore, Gordon had ample opportunity to examine this equipment when he toured the Hydrox plant in October and then when he toured the plant again in November. There is no evidence in the record to support a conclusion that Gordon would not have been welcome, if he so chose, to tour the premises in December or in January before the closing. In addition, the freight elevator and water supply system were not "tangible assets and properties of [the] Seller" but were the property of the landlord. On these facts, we believe the trial court was justified in holding that the plaintiff failed to prove a misrepresentation in regard to the equipment.

Because Gordon failed to prove the first element of a fraud case—that the defendants made untrue statements of material facts—we find it unnecessary to consider Gordon's further arguments on appeal relating to the additional elements of fraud which he claimed that he proved at trial. One such element relates to what the plaintiff claims the defendants knew, should have known or should have attempted to discover concerning the status of the Walgreen-Hydrox relationship. Gordon places great emphasis on the reasons given to him by the Dolins as to why he should not contact Walgreen. This is apparently an attempt by Gordon to create an inference that the Dolins already knew the Walgreen-Hydrox relationship was in flux, should have known or had a duty to find out. Such matters only become relevant after a misrepresentation of material fact has been established. Similarly other elements of fraud, including the victim's reliance on the misrepresentations and the plaintiff's injury, also become relevant only after a misrepresentation has been established.

Also, because Gordon failed to prove his cause of action for common law fraud which would entitle him to relief under the law, we find it unnecessary to consider his further arguments on appeal concerning his right to rescission or his right to damages. Before a plaintiff is entitled to relief, he must first establish a substantive right to relief. (Dobbs, Remedies §1.1, at 1 (1973).) In the instant case, the plaintiff failed to establish such a right.

Gordon next contends that he is entitled to relief because the de-

fendants breached certain warranties contained in the purchase agreement, specifically sections 2.6(a) and 2.6(h). Pursuant to section 2.6 of the agreement, the sellers warranted to Gordon that between September 30, 1978, and the date of closing there had not been:

"(a) any material and adverse change in the financial condition, properties, assets, liabilities, or *business* of Seller;

\* \* \*

(h) any other event or condition materially and adversely affecting the properties and assets of the *business* of Seller." (Emphasis added.)

The defendants argued in the court below that section 6.4 of the agreement controlled the loss of Walgreen's business, and modified and limited the warranties cited. Section 6.4 states:

"*No Reduction in Business or Loss of Customers*

Seller shall not have received actual notice from any customer prior to the closing date that, prior to, on, or after the Closing Date, such customer will or intends to (a) discontinue to purchase from Seller any of the products manufactured and sold by Seller to such customer or (b) reduce the annual amount of such products to be purchased from Seller from the annual amount purchased by such customer from Seller prior to the Closing Date and Seller and Dolin shall deliver a certificate to Buyer to that effect at the Closing."

On appeal, Gordon claims that under the plain language of section 6.4 it only relates to his absolute right to terminate the agreement if such events occurred between the execution date of the agreement and the closing date of the transaction and that the protection contained in section 6.4 is in addition to, not in limitation of, the protection afforded him under section 2.6 of the agreement. Gordon further claims that whether the defendants knew or did not know that Walgreen had made a policy decision to split their business, this decision in fact took place during the warranty period and caused a change in Hydrox' business. Therefore, the warranties contained in section 2.6 were automatically breached.

■■ The trial court held that the provisions of section 6.4 of the agreement setting out that the Seller had to have "actual notice" from a customer that he intended to reduce or discontinue purchases from the seller modified and limited the provisions of section 2.6(a) and 2.6(h). We believe that this decision was correct on both the facts and the law. Various evidence was presented at trial concerning the intent of the parties that supports the trial court's conclusion concerning the limiting effect of section 6.4 Albert Dolin testified that when he changed the notice provision in section 6.4 to require "actual" notice, he did so because he wanted the agreement to be clear, unambiguous, and precise as it related to the reduction in business

or the loss of customers. He testified that this was the reason that he gave at the time for this change to Gordon's attorney. At trial, Gordon's attorney corroborated Albert Dolin's statements on this subject. Since no conflicting evidence of the intent of the parties on this point is cited to us by Gordon, we believe the evidence sufficient to support the trial court's conclusion. Furthermore, we believe that the trial court's conclusion is correct as a matter of law. Section 6.4 specifically addresses the subject of customer losses while section 2.6(a) and (h) speak generally about change in the "business." Where a contract contains both general and specific provisions relating to the same subject, the specific provision is controlling. *Faith v. Martoccio* (1974), 21 Ill. App. 3d 999, 316 N.E.2d 164.

■■ It seems clear, however, that if sections 2.6(a) and (h) were to remain unmodified by section 6.4, a trial court could still conclude that the defendants did not breach their warranties concerning a loss of business. Evidence in the record supports a conclusion that Hydrox did not lose any business during the warranty period. In November, Walgreen placed an order for approximately 100,000 bottles of hydrogen peroxide, and Hydrox billed Walgreen approximately $51,291.60 for this order during the warranty period. In December, Walgreen placed 11 new orders with Hydrox which resulted in billings of approximately $31,159.62. Therefore, in spite of Walgreen's policy to shift business, an actual loss of business to Hydrox during the warranty period was not effectively proved by Gordon. A plaintiff is required to prove the essential elements of his case in actions based on breach of warranty. (*Shramek v. General Motors Corp.* (1966), 69 Ill. App. 2d 72, 216 N.E.2d 244.) Thus, it appears that the ultimate impact of Walgreen's shift in policy on Hydrox' business was at best speculative during the warranty period and the plaintiff's claim of breach of warranty must fail.

■■ Gordon finally contends that the trial court erroneously failed to grant him relief under the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1979, ch. 121½, par. 261 *et seq.*) because even an innocent misrepresentation is a violation of the Act. We have already addressed ourselves to the plaintiff's failure to prove a culpably innocent misrepresentation. Therefore, since the plaintiff is required to establish each element of his case under the Act (*Duo-Tint Bulb & Battery Co. v. Moline Supply Co.* (1977), 46 Ill. App. 3d 145, 360 N.E.2d 798), we do not believe that the trial court was in error when it failed to grant Gordon relief under the Act.

For the above reasons we affirm the decision of the trial court.

Affirmed.

JOHNSON, P. J., and ROMITI, J., concur.