2020 IL App (1st) 190895

SIXTH DIVISION
September 18, 2020

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-19-0895

| | | |
|---|---|---|
| METROPOLITAN CAPITAL BANK & TRUST, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 L 007893 |
| | ) | |
| ZVI FEINER and HINDE FEINER, | ) | Honorable |
| | ) | James E. Snyder, |
| Defendants-Appellees. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Cunningham and Connors concurred in the judgment and opinion.

**OPINION**

¶ 1 In this action for common law fraud and conspiracy to defraud the lender, Metropolitan Capital Bank & Trust (Metropolitan) alleged that one of the borrowers, defendant Zvi Feiner, made misrepresentations in a loan underwriting process. After four defaults on a loan for which Mr. Feiner was a guarantor, Metropolitan entered into a fifth modification of the loan, in exchange for additional collateral represented by Mr. Feiner to be unencumbered. This modification added Mr. Feiner as a borrower. The borrowers again defaulted, and summary judgment was entered in Metropolitan's favor on its breach of contract claim against them for failing to pay back the loan.

¶ 2 Metropolitan's fraud and conspiracy to defraud claims against Mr. Feiner and his wife,

Hinde Feiner, proceeded to a bench trial. The trial court agreed with Metropolitan that Mr. Feiner had misrepresented the status of the collateral but found that the bank failed to prove that it was justified in relying on that misrepresentation or had suffered any damages as a result. Because Metropolitan failed to prove fraud, its conspiracy to defraud claim against the Feiners also failed.

¶ 3     On appeal, Metropolitan argues that (1) the trial court incorrectly applied a clear and convincing evidentiary standard rather than a preponderance standard to the elements of reasonable reliance and damages, (2) Metropolitan sufficiently proved those elements under either standard, and (3) Metropolitan also proved that the Feiners conspired to defraud Metropolitan.

¶ 4     For the reasons that follow, we affirm the judgment of the trial court.

¶ 5                            I. BACKGROUND

¶ 6     At the time of trial, the Rosewood Facilities were comprised of 14 nursing homes and real estate holding companies in Illinois and Missouri. YMPL Trust I (YMPL I) and YMPL Trust II (YMPL II) had ownership interests in the Rosewood Facilities, Bravo Holding Company (Bravo) managed their operations, and Cahill-Rosewood-II, LLC (Cahill-Rosewood-II) owned real estate where the facilities were located. The Feiners were connected in various ways to these entities. Ms. Feiner was the president and a 50% owner of Bravo, and Mr. Feiner owned Rosewood Propco Manager, LLC (Rosewood Propco), the Delaware limited liability company that managed Cahill-Rosewood-II.

¶ 7     In the fall of 2014, Bravo, YMPL I, and YMPL II borrowed $4.5 million from Metropolitan to restructure Bravo's debt on the Rosewood Facilities. The claims at issue in this appeal stem from representations made by Mr. Feiner during the fifth and final modification to that loan, which took place in March 2017.

¶ 8                                  A. The Evidence at Trial

¶ 9    A one-day bench trial was held in this case on March 28, 2019. The trial judge heard testimony from three witnesses—both of the Feiners and Phillip Wilson, a senior vice president at Metropolitan and head of its Midwest region—and received into evidence all of the relevant loan documents and underwriting materials.

¶ 10                        1. History of the Loan and Its Modifications

¶ 11    As a vice president, Mr. Wilson oversaw the team of three individuals at Metropolitan involved in underwriting the initial loan in this matter. The anticipated source of repayment was Bravo. Mr. Feiner served as a personal guarantor, and his interest in Rosewood Propco was pledged as collateral. The loan was modified four times between late 2015 and late 2016, each time because Bravo was having cash flow issues and the borrowers were in default. In each instance, Metropolitan extended the amortization schedule on the loan and reduced the monthly cash-flow burden on the borrowers without requiring any additional collateral.

¶ 12    By early 2017, the borrowers were again delinquent in their payments. According to Mr. Wilson, it "became clear *** that the underlying Rosewood portfolio was not performing as expected and was not in any near term going to be able to meet the debt service requirements." Metropolitan was willing to accommodate the borrowers with a fifth modification that would further ease their monthly cash-flow burden, but this time the bank wanted additional collateral. To satisfy this requirement, on March 31, 2017, Mr. Feiner pledged his right to receive membership distributions from two Delaware limited liability companies: FNR Norridge, LLC (FNR Norridge) and FNR Woodview, LLC (FNR Woodview). Cash flow from this collateral was also intended to service the loan. Metropolitan set up an account into which the distributions from the FNR Norridge and FNR Woodview entities—which flowed through a third entity, FNR

Healthcare, that Mr. Feiner owned and controlled outright—would be received. The plan was for the loan payments to be deducted from the distributions and any remaining balance to be remitted to Mr. Feiner on a monthly basis. With this modification, Mr. Feiner also became a borrower and not just a guarantor, something his lawyer requested because it would help him pay off the loan "without interference from his investors" and would "assist [him] in dealings with his former partner."

¶ 13    It soon became clear, however, that no money from the FNR Woodview or FNR Norridge entities was flowing through FNR Healthcare into the account set up to service the loan. It was not until July 2017, when Metropolitan was "doing its research into how [it was] going to go about collecting this loan," that the bank discovered that FNR Norridge had in fact already been pledged as collateral to an entity known as SLG Limited Partnership (SLG).

¶ 14    Mr. Wilson insisted that Metropolitan would not have agreed to the fifth modification if it had known this, stating:

> "at this point we were 100 percent reliant upon those cash flow distributions to service our debt, and we were making accommodations for the borrower to extend the amortization. We were giving him extensions on the loan. We were doing a number of things that we wouldn't have done had we known that somebody could step in in front of us, and we'd be in the exact same position we were in right now."

¶ 15            2. How the Bank Came to Agree to a Fifth Loan Modification

¶ 16    Mr. Wilson explained that because Metropolitan offers nontraditional loans often not secured by traditional mortgages, the bank's loan underwriting process varies for each loan. When Metropolitan receives a borrower's or guarantor's personal financial statement, it uses a LexisNexis® tax, lien, and judgment search (TLJ search) to retrieve various documents that it uses

4

to corroborate the information contained in that statement. According to Mr. Wilson, a TLJ search can include "everything from IRS tax liens to possible residences, to, you know, a boating license, criminal activity, things like that." Mr. Wilson explained that Metropolitan uses those sources:

> "to confirm each other in the sense that we look at tax returns to confirm what the borrower or guarantor is saying about their cash flow; we look at the global cash flow statement, the real estate schedule to confirm what they're saying is the value of their real estate portfolio; and so they all sort of go together in our underwriting to make sure that we believe that this borrower can not only service but repay the loan eventually."

¶ 17    Mr. Feiner's signed 2014 personal financial statement, which he provided to Metropolitan during underwriting for the initial loan, listed three debts owed to SLG, totaling $33.8 million dollars, but did not indicate that an interest in the FNR Norridge entity had been pledged to SLG. When a borrower or guarantor submits a financial statement that is not on Metropolitan's own form, he or she is also required to submit a personal financial statement addendum. In the addendum submitted on July 25, 2014, Mr. Feiner responded "no" to the question "[a]re any assets pledged other than as described on the schedules? If so, describe." And in the "Representations and Warranties" section, he indicated "[t]here exists no prior assignment or pledge of the pledged collateral."

¶ 18    Mr. Wilson testified that each time Metropolitan modifies a loan, it goes through an additional underwriting process. He explained that procedure as follows:

> "We would collect any information that was considered stale, so a personal financial statement that was older than a year, any liquidity statements that were older than three months or six months, any tax returns that should have been filed in the interim.
>
> Collect any updated financials that were available, anything to understand why we

were making a change to make an accommodation for the borrower, and to make sure that the accommodation we were making was something that was going to be sustainable."

¶ 19    The TLJ search Metropolitan ran on Mr. Feiner in connection with the fifth loan modification was over 100 pages long. Nothing in the document itself revealed that Mr. Feiner had already pledged his right to FNR Norridge distributions. The report disclosed a list of 10 active UCC-1 filings, however, including one for SLG. Mr. Wilson explained that UCC-1 filings—forms filed with the secretary of state when a lender accepts an interest in an LLC or some other intangible asset as collateral for a loan—often appear in Metropolitan's TLJ searches. According to Mr. Wilson, it was not the bank's practice to review each UCC-1-filing because "it's very common for real estate people especially to have a number of UCCs against them," and Metropolitan has "a number of borrowers that would produce tens if not hundreds of UCCs." Metropolitan would generally only review a UCC-1 listed in a TLJ search if it was "told by the borrower or borrower's counsel that there was already a pledge against an asset," if "there was a lender that showed up on the UCC schedule that didn't show up on the borrower's global cash flow or on their personal financial statement," or if it appeared on the face of the report that the UCC-1 filing was specifically related to an asset the bank was taking pledge of.

¶ 20    Metropolitan did not retrieve any of the UCC-1 filings listed in the TLJ search it ran in January 2017 because, according to Mr. Wilson, "[t]here were no lenders *** that stuck out as unusual. All of these various entities appeared to show up on [Mr. Feiner's] personal financial statement." If Metropolitan had pulled the UCC-1 filing for SLG, as it did later in July 2017, when it realized there was a problem with the cash flow from the FNR Norridge entity, the bank would have discovered, contrary to Mr. Feiner's assertions, that SLG held a priority interest in distributions from the FNR Norridge collateral.

¶ 21    According to Mr. Wilson, when Metropolitan was assessing the various interests Mr. Feiner might be able to pledge as security for the fifth loan modification, the bank proposed a collateral structure that included Mr. Feiner's cash flow from a third entity called FNR Vermillion. In an e-mail dated January 30, 2017, however, Mr. Feiner told the bank, "Vermillion is a problem and cannot be pledged at this time." Mr. Wilson understood this to mean "Vermillion either is pledged or cannot be pledged because of some partnership issue." But Mr. Feiner further wrote, "Norridge and Woodview are free and clear and can be pledged, and the cash flows are fine." According to Mr. Wilson, Mr. Feiner never explained why FNR Vermillion was a problem or who it was pledged to. Nor did he indicate that there was any problem with him pledging his distribution rights in FNR Woodview or FNR Norridge. Mr. Feiner represented that the income from those two entities was "stable and monthly."

¶ 22    When asked at trial about the misrepresentations in his personal financial statements, Mr. Feiner testified that his lawyer told him to sign the documents, so he did, without reviewing them. He blamed Metropolitan for being in a rush to complete the loan restructuring, stating: "The bank was providing a great deal of pressure on me and my attorney to get something signed by the end of the quarter, March 31st, because they had to answer to the regulators, and they needed something done so the loan would not remain in default." Mr. Feiner acknowledged, however, that he was aware that Bravo and the two YMPL Trusts were in default on the fourth loan modification before he signed on as an additional borrower to the fifth modification and that, as the guarantor on the loan up to that point, he would have been responsible for that default if the parties had not been able to agree on the terms of a fifth modification.

¶ 23    Mr. Wilson acknowledged on cross-examination that Metropolitan did not have Mr. Feiner's 2016 tax return at the time of the underwriting and Metropolitan "relied upon his oral

statement, his written statement, his attorney's written statement, [and] the financials of the underlying properties that were provided by him" for information related to how much Mr. Feiner received in 2016 and 2015 as distributions from FNR Norridge and FNR Woodview. Mr. Wilson could not recall which documents the bank requested as part of its due diligence but, to the best of his knowledge, Metropolitan did not receive the FNR Norridge 2016 or 2015 tax returns prior to executing the March 31, 2017, loan modification.

¶ 24    Mr. Wilson agreed as a general principle that "the level of concern of the bank would be greater when [a] loan is in default," but when asked if this would have prompted the bank "to do more rather than less investigation into the status" of the pledged collateral in this matter, he said, "[w]e didn't do any more or less. We did the exact same that we normally do."

¶ 25                                3. Hinde Feiner's Role

¶ 26    Ms. Feiner testified that she was president and director of Bravo but that she held those titles without actually performing the duties of a president or director and indeed knew nothing about the operations of the company. She described herself as "a stay-at-home mom with five kids." Ms. Feiner further explained that she gave her attorney and her husband authorization to sign any documents on her behalf, regardless of any legal obligation she would incur as a result, without first reviewing the documents. Ms. Feiner estimated that since approximately 2013, she had made legal obligations on behalf of 10 to 15 different companies by signing or allowing various documents to be signed with her name. As the president of Bravo, she signed the third loan modification in March 2016. Ms. Feiner admitted that she did not review the loan documents before signing. The fourth loan modification, made in October 2016, bore Ms. Feiner's signature but she testified that she had not actually signed it. Ms. Feiner signed the fifth loan modification and revised promissory note as the president of Bravo, despite the fact that she had no

communications with any representative of Metropolitan over the telephone, in person, or through e-mail and had again failed to review the documents before signing them. By way of explanation, Ms. Feiner merely stated that she had been "[y]oung and dumb."

¶ 27                    B. Closing Arguments and the Trial Court's Findings

¶ 28    In his closing argument, counsel for Metropolitan argued that the bank took the "reasonable" efforts that it needed to in order to protect its interest, stating:

> "Metropolitan undertook its due diligence process and followed its procedures. Could the bank have found the UCC if it overturned everything? Sure. I don't believe the law requires it. The law only requires a reasonable effort to look into the—to look into the statements that were made.
>
> As Mr. Wilson testified, he relied on both the written and oral statements of Mr. Feiner, he relied on the written and oral statements of Mr. Feiner's lawyer, and he relied on the fact that there's nothing untoward or surprising in the searches that they ran on Mr. Feiner's background when they were doing the extension of the fifth modification."

¶ 29    In response, counsel for the Feiners argued that Metropolitan had not met its burden of proving each of the elements of fraud by clear and convincing evidence. At the time of Mr. Feiner's representations, the bank had already entered into four loan modifications as a result of "substantial financial defaults for nonpayment" and its due diligence had uncovered a list of 10 UCC-1 filings with corresponding file numbers, but "the bank did nothing to pull the UCCs." Counsel argued that, while under other circumstances it might have been reasonable for Metropolitan to look no further than documentation provided by the borrower, given the particular circumstances of this loan's history, the bank should at least have reviewed the UCC-1 filings that were flagged in its report.

¶ 30    The trial court entered judgment in favor of the Feiners on Metropolitan's claims for fraud and conspiracy to defraud. The judge believed that Metropolitan had "certainly proved that the defendant, Mr. Feiner, made material misrepresentations of fact in this loan transaction process" regarding "the Norridge entity." Indeed, the trial court judge noted that he did not find Mr. Feiner to be a credible witness and "was more than a little surprised at the occasions on which he thought that things were laughable and he laughed while testifying."

¶ 31    The court nevertheless concluded that the bank had failed to prove justifiable reliance and a corresponding theory of damages by clear and convincing evidence. The judge explained that this conclusion was based on the credible testimony of Mr. Wilson "that the nature of [Metropolitan's] business is to make nonconventional and non usual [*sic*] loans; and that in this circumstance [the bank] was going into a fifth modification where [it] knew that the [borrower] was in default," and yet it still failed to follow up on the UCC reports that would have demonstrated the pledged collateral was encumbered. In the trial court's view, Metropolitan "certainly should have chased down this UCC, this SLG UCC, and that is frankly what dooms the plaintiff's case in that regard." Because Metropolitan failed to prove fraud, the trial court concluded that its claim for conspiracy to defraud failed as well.

¶ 32    Metropolitan now appeals the court's finding as to both counts.

¶ 33                                    II. JURISDICTION

¶ 34    The circuit court entered its final judgment on March 28, 2019, and Metropolitan timely filed its amended notice of appeal on April 26, 2019. This court has jurisdiction pursuant to Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 35                                        III. ANALYSIS

¶ 36    On appeal, Metropolitan argues the trial court erred by (1) applying a clear and convincing evidentiary standard to the reasonable reliance and damages elements of fraud, (2) concluding that Metropolitan failed to prove either of those elements, and (3) additionally concluding that Metropolitan failed to prove that the Feiners conspired to conceal Mr. Feiner's misrepresentations. We address each issue in turn.

¶ 37                                   A. Evidentiary Standard

¶ 38    The elements of common law fraud are

> "(1) [a] false statement of material fact (2) known or believed to be false by the party
> making it; (3) intent to induce the other party to act; (4) action by the other party in
> [justifiable] reliance on the truth of the statement; and (5) damage to the other party
> resulting from such reliance." (Internal quotation marks omitted.) *Gerill Corp. v. Jack L.*
> *Hargrove Builders, Inc.*, 128 Ill. 2d 179, 193 (1989).

¶ 39    At summary judgment, the Feiners cited the clear and convincing evidentiary burden for proving each of the elements of common law fraud. To prove something by clear and convincing evidence, a plaintiff must "leave[ ] no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question." *Parsons v. Winter*, 142 Ill. App. 3d 354, 359 (1986). Clear and convincing evidence is considered "to be more than a preponderance while not quite approaching the degree of proof necessary to convict a person of a criminal offense." *Id.* Metropolitan did not dispute that this was the standard, and in fact did not specifically address the evidentiary standard at all in its own pretrial filings. At the conclusion of the bench trial, the trial judge without comment applied the clear and convincing evidentiary standard to each of the elements of Metropolitan's fraud claim. Metropolitan now argues that it only needed to prove the

11

last two elements of its claim for common law fraud—reasonable reliance and damages—by a preponderance of the evidence. To prove something by a preponderance of the evidence, a plaintiff need only show it is "probably true." *Id.* The Feiners, on the other hand, maintain that the court was correct in requiring proof of each element by clear and convincing evidence. Whether the court applied the correct legal standard to the evidence presented is a question of law we review *de novo*. *In re Marriage of Sobol*, 342 Ill. App. 3d 623, 627 (2003).

¶ 40 There is certainly support for each side's position. Arguing for a split standard of proof, Metropolitan relies on *Parsons*, 142 Ill. App. 3d at 359, which in turn relied on *Gordon v. Dolin*, 105 Ill. App. 3d 319, 324 (1982), for the proposition that a plaintiff must "prove the first four elements [of common law fraud] by direct or circumstantial evidence that is clear and convincing." Those elements—"(1) that the defendant made a statement, (2) of a material nature as opposed to opinion, (3) untrue, (4) known by the person making it to be untrue, believed by him to be untrue, or made in culpable ignorance of its truth or falsity" (*Parsons*, 142 Ill. App. 3d at 359; *Gordon*, 105 Ill. App. 3d at 324)—correspond to the first two elements of the cause of action, as they were later restated by our supreme court in *Gerill*. *Gerill*, 128 Ill. 2d at 193. Under this line of cases, it would seem that the remaining elements—justifiable reliance and damages—need only be proved by a preponderance of the evidence. In conflict with these cases, and supporting a unified standard of proof, is *Cole v. Ignatius*, 114 Ill. App. 3d 66, 74 (1983), which relied on *National Republic Bank of Chicago v. National Homes Construction Corp.*, 63 Ill. App. 3d 920, 924 (1978), for the proposition that "[p]roof of *each element* in an action for fraud must be clear and convincing." (Emphasis added.)

¶ 41 This is indeed an unusual circumstance in which two alternative Illinois Pattern Jury Instructions exist that are completely at odds with one another. Compare Illinois Pattern Jury

Instructions, Civil, No. 800.02A (approved July 18, 2014) (hereinafter IPI Civil No. 800.02A) (aligning with *Parsons* and *Gordon*) and IPI Civil No. 800.02B (aligning with *Cole* and *National Republic*); see also *Napcor Corp. v. JPMorgan Chase Bank, NA*, 406 Ill. App. 3d 146, 157 (2010) (noting that both instructions find support under prevailing law).

¶ 42    Having considered these authorities, we are not persuaded that the trial court applied the wrong standard in this case. Interestingly, as support for the diverging standards they announced, *Gordon* and *National Republic* both relied on the *same* authority: our supreme court's 1941 decision in *Racine Fuel Co. v. Rawlins*, 377 Ill. 375 (1941). The plaintiff in *Racine* alleged that the defendant and another individual conspired to defraud it out of a portion of the purchase price of coal. *Id.* at 377. The court noted that "transactions are presumed to be fair and honest until the contrary is proved by clear and convincing evidence," "[f]raud is not presumed but must be proved like any other fact by clear and convincing evidence," and "[i]t is not sufficient that there be mere suspicion of fraud but fraud, if it exists, must be satisfactorily shown." *Id.* at 379-80. The court then concluded that in support of a claim of fraud, as opposed to "an action merely for recovery of balance on account," the evidence presented at trial had been insufficient. *Id.* Nowhere in its decision did the *Racine* court list the elements of a claim of fraud, differentiate between standards of proof necessary to establish each of those elements, or even mention the element of justifiable reliance.

¶ 43    *Racine* stands for the unremarkable proposition that fraud claims are held to a higher evidentiary standard. That is as true today as it was in 1941. In *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 191 (2005), our supreme court, citing *Racine*, reiterated that "the law presumes that transactions are fair and honest" and "fraud is not presumed." This is why claims of common law fraud constitute an exception to the general rule in civil cases—where

13

there are "no sound reasons for favoring one party over another"—that "the party with the burden of persuasion must prove his or her case by a preponderance of the evidence." *Id.* While *Avery* recognized that "[o]ccaisionally *** policy considerations require a court to impose a higher standard of proof," it noted that, in such cases, "the party with the burden of persuasion must prove his or her *case* by clear and convincing evidence," not certain *elements* of his or her case. (Emphasis added.) *Id.* Although *Gordon* was cited by the *Avery* court, it was only for the proposition that "in a common law fraud action, the plaintiff carries 'a heavy responsibility' " (*id.* at 192 (quoting *Gordon*, 105 Ill. App. 3d at 324)), not as an endorsement of the split standard of proof articulated in that case. In sum, we read nothing in *Racine*, *Avery*, or any other controlling authority supporting a split standard of proof, pursuant to which some—but not all—of the elements of a claim of fraud are subject to a heightened standard. Historic concerns raised by Metropolitan, regarding which elements of the cause of action bear on "the character of the wrongdoer" and which do not, strike us as outdated. Such concerns certainly pale, in our view, in comparison to the difficulties trial courts would face in applying two standards of proof to the elements of a single cause of action.

¶ 44    In sum, we cannot say that the trial court in this case—faced with two diverging lines of first district cases on an issue our supreme court has not specifically addressed—made a reversible error of law by applying the line of cases finding that each of the elements of common law fraud must be proved by clear and convincing evidence. Finding no error, we next consider whether, under this standard, the trial court's finding that Metropolitan failed to prove it justifiably relied on Mr. Feiner's misrepresentations was against the manifest weight of the evidence.

¶ 45                              B. Reasonable Reliance

¶ 46    "When, as in this case, a party challenges the sufficiency of the evidence to support a

14

judgment following a bench trial, our standard of review is whether the trial court's judgment is against the manifest weight of the evidence." *Kroot v. Chan*, 2017 IL App (1st) 162315, ¶ 19. This is a deferential standard, under which "[a] reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *Offord v. Fitness International, LLC*, 2015 IL App (1st) 150879, ¶ 16. Accordingly, "[a] finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Id.*

¶ 47 Metropolitan concedes that it "was required to take reasonable efforts to determine the veracity of [Mr.] Feiner's statements," but insists that it was "not required [to] make every conceivable effort to uncover and ferret out [his] multi-year fraud." In determining what constitutes justifiable reliance—a phrase used interchangeably with "reasonable reliance" (see, *e.g.*, *Ringgold Capital IV, LLC v. Finley*, 2013 IL App (1st) 121702, ¶ 37)—in a given case, "courts consider all of the circumstances surrounding the transaction, including the parties' relative knowledge of the facts available, opportunity to investigate the facts and prior business experience." *Hassan v. Yusuf*, 408 Ill. App. 3d 327, 350 (2011). This includes not only those facts actually known to the plaintiff but also "those facts [the] plaintiff could have learned through the exercise of ordinary prudence." *Ringgold Capital*, 2013 IL App (1st) 121702, ¶ 37. Our supreme court has explained that "one is justified in relying upon the representations of another, without independent investigation, where the person to whom the representations are made does not have the same ability to discover the truth as the person making the representations." *Gerill*, 128 Ill. 2d at 195. Where parties "have equal knowledge or means of obtaining knowledge of the misrepresented facts," a plaintiff's reliance on a defendant's material misrepresentation is only

justifiable where the defendant "has created a false sense of security or blocked further inquiry," and where "the facts were not such as to put a reasonable person on inquiry." *Hassan*, 408 Ill. App. 3d at 350.

¶ 48      This is an incredibly fact-specific inquiry for which it is helpful to consider some examples. In *Gerill*, 128 Ill. 2d at 184, two parties formed a joint venture to develop land but, after a few years, decided the project was not sustainable and began exploring the idea of a buyout. The defendant, who had been in charge of the operation's finances, drew up a list of the venture's outstanding loans and open invoices. *Id.* Based on this financial information, a contract was drawn up and arrangements were made for the defendant's interest in the venture to be purchased by a third party, who agreed to indemnify the defendant from any outstanding liabilities. *Id.* at 185. The third party subsequently hired an independent accountant to review the records and discovered that the joint venture's liabilities were far greater than the defendant had represented. *Id.* at 185-86. Our supreme court held that, as to $800,000 of the $1.1 million dollars in excess liabilities claimed, the third party's reliance on the misrepresentations was unjustified because "through reasonable and prudent diligence," he could himself have discovered the existence of the taxes, mortgages, and loans. *Id.* at 194. The court allowed for recovery of construction costs, however, because information regarding construction work and supplies "were matters almost exclusively within the knowledge of [the defendant] and it would have been difficult, if not impossible, for [the third-party purchaser] to discover them." *Id.* at 194-95.

¶ 49      In *Hassan*, 408 Ill. App. 3d at 329, the plaintiff entered into an agreement with two defendants to purchase a gas station, under which the parties were to contribute equally, share equally in the profit, and use the proceeds to pay the mortgage. *Id.* at 343-44. Although the defendants represented to the plaintiff that he would be a one-third owner of the gas station,

including the underlying real estate, title was instead conveyed to a corporation owned only by the defendants. *Id.* This court held that there was sufficient evidence in the record to support the trial court's finding that the plaintiff justifiably relied on the defendants' representations "without further inquiry or investigations" because (1) the plaintiff "was relatively new to this country when he entered into [the] business transaction," (2) the plaintiff trusted the defendants as a result of their longstanding friendship, (3) the plaintiff knew the defendants had experience with owning and operating a gas station, and (4) "the evidence [did] not appear to suggest that [the] plaintiff had a reason to suspect that he may not have an ownership in the real estate because he paid the mortgage on behalf of [the corporation owned by the defendants] as a form of rent." *Id.* at 351-52.

¶ 50 Here, the trial judge found Mr. Feiner's testimony unreliable and felt that Metropolitan proved that he had made material misrepresentations regarding his rights in the FNR Norridge collateral. However, based on the evidence introduced at trial, the court found Metropolitan failed to prove that it was justified in relying on those misrepresentations. With regard to this finding, the trial court explained "that on January 12th, 2017, *** the [bank] received the UCC report regarding the borrower. There is a list and a reference by line number on it to the SLG UCC statement, which easily could have been identified." Because publicly filed information contradicting Mr. Feiner's representations regarding the Norridge collateral was readily available to Metropolitan, the court concluded that the bank could not have reasonably relied on Mr. Feiner's assurances that the collateral was unencumbered.

¶ 51 Unlike in *Hassan*, Metropolitan had reason to follow up on Mr. Feiner's representations. The borrowers had continually been unable to make their loan payments after representing an ability to pay with each modification, and, as Mr. Wilson said, provision of this additional collateral was key to Metropolitan's decision to enter into a fifth loan modification. Unlike with

17

the construction expenditures in *Gerill*, information regarding the UCC-1 filing was not exclusively within Mr. Feiner's knowledge or something that it would have been difficult for Metropolitan to discover. The trial court's determination that the bank should have conducted at least some investigation into Mr. Feiner's representations was not against the manifest weight of the evidence.

¶ 52 Cases Metropolitan relies on, in which the defendants actively created a false sense of security or blocked investigation into the nature of their misstatements, simply do not apply here. In *Mother Earth, Ltd. v. Strawberry Camel, Ltd.*, 72 Ill. App. 3d 37, 40-41 (1979), a defendant selling a nightclub falsely represented the club yielded monthly profits of $10,000. Because the statement was not "inherently implausible," and because the seller "inhibited" the purchasers' inquiries "by telling them that the business' books were unavailable," the court held reliance on this misrepresentation was reasonable without the purchasers "[t]ak[ing] such steps as monitoring the business in order to test the accuracy of this statement." *Id.* at 51-52. Similarly, in *Carter v. Mueller*, 120 Ill. App. 3d 314, 320 (1983), the plaintiff failed to inspect an apartment before signing the lease. Because the defendant had "precluded investigation" by lying and saying a key was not available to unlock and inspect the apartment and had falsely reassured the plaintiff that " 'everything had been done,' " the appellate court ruled the trial court's finding that reliance was not reasonable was against the manifest weight of the evidence. *Id.* The court noted that "where the person making the statement has inhibited [the] plaintiff's inquiries by either creating a false sense of security or blocking investigation, the failure to inquire is not fatal" *Id.* at 319. Here, there is no evidence that Mr. Feiner blocked Metropolitan's investigation, nor does Metropolitan make such a claim.

¶ 53 Metropolitan also cites *Mother Earth*, 72 Ill. App. 3d at 52, for the proposition that even if

the plaintiff in an action for fraud was negligent for failing to insist on verification of an alleged misrepresentation, fraud is "an intentional tort, and it is well settled that an action for an intentional tort cannot be defeated by an assertion of negligence on the part of the plaintiff." This court has held, however, that this rule "is qualified in that the defrauded party must first show he had a right to rely on the misrepresentations." *Smith v. Ethell*, 144 Ill. App. 3d 171, 175 (1986). We have similarly qualified the proposition, for which Metropolitan relies on the Restatement (Second) of Torts § 540 cmt. a, Illustration 1 (1977), that a fraudulent misrepresentation may be relied on even when its falsity could be discovered without considerable trouble or expense by reviewing public records. See *Chicago Title & Trust Co. v. First Arlington National Bank*, 118 Ill. App. 3d 401, 409 (1983) (stating that this too, "of course, does not obviate the requirement that [the] plaintiff's reliance must be justifiable" and noting the tendency for courts to resolve the tension between the disparate lines of cases concerning justifiable reliance on a case-by-case basis).

¶ 54    Here, there is support in the record for the trial court's determination that, following the borrowers' fourth default, Metropolitan, as a sophisticated lender specializing in nontraditional loans requiring personal guarantees, should not have simply relied on Mr. Feiner's representations regarding the status of the pledged collateral. Unlike in *Mother Earth*, there was no impediment to Metropolitan's investigation. According to Mr. Wilson's testimony, Metropolitan ran another TLJ search in July 2017 to determine how the bank might collect on the loan and was able to find the UCC-1 filed against the collateral and discover the encumbrance. Given all of the circumstances surrounding this loan and the parties' relationship, the trial court's determination that such a search was not onerous and should have been performed by Metropolitan in this case is supported by the record. The court's finding that Metropolitan failed to prove by clear and convincing evidence that it was justified in relying on Mr. Feiner's misrepresentations was not against the manifest weight

of the evidence.

¶ 55                     C. The Remaining Issues on Appeal

¶ 56    We need not consider the sufficiency of the evidence with regard to damages because we affirm the trial court's finding that Metropolitan failed to prove it justifiably relied on Mr. Feiner's false statements. And because, as Metropolitan concedes, "conspiracy is not an independent tort" and "fails if the independent cause of action underlying the conspiracy allegation fails" (*Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 59), the court's judgment in favor of the Feiners on the bank's conspiracy to defraud claim is also affirmed.

¶ 57                            IV. CONCLUSION

¶ 58    For all of the above reasons, we affirm the judgment of the trial court in favor of the Feiners on Metropolitan's fraud and conspiracy to defraud claims.

¶ 59    Affirmed.

**No. 1-19-0895**

| | |
|---|---|
| **Cite as:** | *Metropolitan Capital Bank & Trust v. Feiner*, 2020 IL App (1st) 190895 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-L-007893; the Hon. James E. Snyder, Judge, presiding. |
| **Attorneys for Appellant:** | Joseph W. Barber and Ariane M. Janz, of Howard & Howard Attorneys PLLC, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Ariel Weissberg and Frank Lara, of Weissberg & Associates, Ltd., of Chicago, for appellees. |