2023 IL App (1st) 220971-U

FIRST DISTRICT,
FIRST DIVISION
June 20, 2023

No. 1-22-0971

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| GUY BATTISTA, LUANNE BATTISTA, and G&L CONTRACTORS, INC., | ) ) ) | Appeal from the Circuit Court of |
| Plaintiffs-Appellants, | ) ) | Cook County, Illinois. |
| v. | ) ) | No. 2021 L 7856 |
| PAUL KATZ, PSK & COMPANY, ACTUARIAL ADMINISTRATORS, INC., and CJA & ASSOCIATES, INC., | ) ) ) ) ) | Honorable Daniel J. Kubasiak, Judge Presiding. |
| Defendants-Appellees. | ) | |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Lavin and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1    *Held*:  In common-law fraud action, defendants were entitled to summary judgment where (1) their statements about tax treatment of contributions to employer benefit plan were opinions about an unsettled area of law and were not knowingly false when made, and (2) defendants' statements regarding amounts that plan participants might obtain from selling death benefits to third-party buyers were explicitly framed as uncertain "projections" rather than facts.

¶ 2    In 2017, plaintiffs Guy Battista, Luanne Battista, and G&L Contractors, Inc. ("G&L")

brought a common law fraud action against defendants Paul Katz, PSK & Company ("PSK"),

and CJA & Associates, Inc. ("CJA") [1] in connection with the Affiliated Employers Health & Welfare Trust Plan ("the Plan"). Plaintiffs alleged that Katz and CJA induced them to join the Plan in 2001 by falsely representing that plaintiffs' contributions to the Plan were tax deductible and falsely marketing the Plan as a "pension plan" when, in fact, the Plan provides only death benefits and not any pension, cash value, or retirement benefits.

¶ 3    The trial court granted defendants' motion for summary judgment, finding that plaintiffs' claims were barred by the five-year statute of limitations for fraud, and, in any case, defendants' alleged misrepresentations were "nonactionable opinion[s] and/or true statement[s] that cannot form the basis of a fraud claim." For the reasons that follow, we affirm.

¶ 4                                    BACKGROUND

¶ 5    At all relevant times, plaintiffs Guy Battista and his wife Luanne Battista were owners and employees of G&L, a company that hauls and lays cement at construction projects in the Chicago area. Guy is also the president of G&L. Defendant Paul Katz is an insurance broker who owns PSK, a life insurance brokerage business. Defendant CJA is an independent marketing organization retained by insurance companies to market their products.

¶ 6    One product marketed by CJA was the Plan, which, according to Jeffrey Bleiweis, vice president and general counsel of CJA, was created in 1992 as "a vehicle for [e]mployers to provide death benefits to their eligible [e]mployees." In an affidavit and a deposition, Bleiweis attested that employers in the Plan make contributions to a trust, which uses those contributions to pay life insurance premiums for group-term life insurance policies which are owned by the trust and which fund the Plan's death benefits. Thus, "[n]o participant in the Plan owns a life insurance policy." The Plan does not provide any other benefits aside from death benefits. After

---

[1] Plaintiffs also asserted claims against Actuarial Administrators, Inc. that were dismissed with prejudice on January 28, 2019 and that are not at issue in this appeal.

a participating employee retires, their death benefit is "paid up," "which means it's guaranteed to remain in place for the rest of the participant's life without the payment of any additional premiums."

¶ 7      In 2001, Guy wished to arrange a "pension plan" for G&L's four non-unionized employees, including his wife and himself. Guy expressed this to G&L's health insurance broker, Matt Berrafato, who referred him to Katz. Guy met with Katz on multiple occasions to discuss joining an employee benefit plan. According to Katz, it was his understanding that Guy wanted to provide benefits for certain employees "on a tax-deductible basis," but Guy did not specify what kind of benefits he wanted.

¶ 8      Katz first learned about the Plan at a promotional seminar hosted by CJA. Based on the seminar and brochures provided by CJA, it was Katz's understanding that employer contributions to the Plan were tax deductible. At his second meeting with Guy, he presented Guy with information on the Plan, including a document titled "PREPare" ("the Proposal") as well as illustrations and brochures drafted by CJA. The Proposal, dated March 8, 2001, states on the title page: "This is not a contract. It is a proposal based on current assumptions which are not guaranteed." It describes the Plan as "a multiple employer health and welfare plan that provides death benefits to the eligible employees of participating employers" and further states: "Employers may deduct contributions to the Plan." (Emphasis in original.) It contains a chart of annual employer contributions and "annual after-tax cost" and states: "Tax bracket assumed is 40.00%." It also states that "[s]hould you need funds during your life, a portion of your policy may be sold for cash" and provides "assumed values" for death benefits and "Projected Payment[s] from Settlement" for each of G&L's employees.

¶ 9          Katz's understanding of the Plan was that it was "not a pension plan," but a life insurance plan with a death benefit. When a participating employee retired from G&L, their policy would be "converted *** to a whole life contract" owned by the individual. (Bleiweis testified that there is "no such thing" as obtaining a "conversion" of the policy and that Katz received incorrect information in this regard from a CJA employee who has since been fired.) After retirement, according to Katz, "[i]f [the participant] chose to sell off part of that death benefit, assuming there's a buyer for it, he could." Such a sale would be a private arrangement with a third-party buyer outside of the plan. Katz testified that he told Guy "about the ownership of the policy and how you could get cash out of it."

¶ 10          On March 19, 2001, Guy joined the Plan by signing the "Joinder Agreement to the Affiliated Employers Health and Welfare Trust Plan" ("the Agreement") on behalf of G&L. The Agreement states that the Plan provides both pre- and post-retirement death benefits, but does not reference pension benefits. By signing, Guy attested that "[i]t is understood and agreed that *** neither the Trustee, Administrator, nor any Insurer or its agents can guarantee or promise that the anticipated favorable tax results will in fact be achieved." In his deposition, Guy stated that he did not read the Agreement because he does not "read stuff like that," but his understanding was that employer contributions were tax deductible and employees would receive both cash value and a death benefit.

¶ 11          On March 31, 2001, Guy signed an "Employee Benefit Plan Disclaimer Statement" ("the Disclaimer") on behalf of G&L relating to the Plan, in which he declared he had read the contract forms and all ancillary documents; he understood that the Baltimore Life Insurance Company and its agents "made no promises or representations about the tax treatment to be accorded to the Employer's contributions ***, including whether the contributions may be

deducted by the Employer"; he had been "advised to consult independent legal and tax counsel regarding the tax treatment to be accorded the Employer's contributions to the Trust for the purchase of the above-described insurance product(s)"; and he had, in fact, consulted independent legal or tax counsel. Guy admitted that he did not read and understand the declaration section before signing. He "considered [his] counsel to be Matt [Berrafato] and Paul [Katz]," but acknowledged that they were insurance brokers, not legal counsel.

¶ 12        Over the next 10 years, G&L paid approximately $940,000 into the Plan before it stopped making contributions in 2011 due to economic difficulties and its participating employees were transitioned from the Plan's pre-retirement death benefits to the Plan's paid-up post-retirement death benefits.

¶ 13        Guy received multiple letters from the IRS in September 2011. The first letter, dated September 7, 2011, notified Guy and G&L that G&L's federal return for the years 2008, 2009, and 2010 "has been selected for examination." The letter requested production of documents related to the "Prepare Plan," described as "an employer welfare benefit plan *** called the Affiliated Employers Health & Welfare Trust Plan, or Prepare Plan, associated with CJA & Associates, Inc.," so that "the Service may evaluate the deductibility of contributions by you or for your benefit to the Prepare Plan under the relevant provisions of the Internal Revenue Code *** together with any income tax consequences."

¶ 14        The second letter, also dated September 7, 2011, referenced G&L's tax returns for the years 2008, 2009, and 2010, and stated: "We are commencing an investigation to determine whether you complied with the requirements of Internal Revenue Code (IRC) § 6011 and the associated regulations."

¶ 15    On October 5, 2011, CJA sent a letter to Guy and G&L stating that it "recently ha[d] been notified by a number of taxpayers that the IRS has commenced audits of taxpayers participating in one of CJA's welfare benefit programs." CJA stated that it had retained counsel "to help CJA assist you in responding to an audit," and further stated: "Based on prior experience, [our counsel] believes that the audit process with the IRS may be a long and arduous process for all of us. However, [our counsel] and CJA are confident that your audit will be resolved in your favor." CJA additionally recommended that Guy and G&L retain independent counsel to represent them through the audit process and included contact information for "an experienced welfare benefit plan lawyer." Guy did not hire a lawyer upon receipt of this letter because he "didn't think it was needed at that point."

¶ 16    Following an investigation, on October 30, 2014, the IRS sent a letter notifying Guy that it was denying the deductions taken by G&L for its payments into the Plan for 2008, 2009, and 2010, and requiring G&L to pay back the amount of the disallowed deductions as well as penalties and interest. Guy received the letter on November 6, 2014.

¶ 17    On June 19, 2017, plaintiffs filed the instant action against Katz, PSK (collectively "the Katz defendants"), and CJA. In their fifth amended complaint, plaintiffs alleged that Katz induced them to join the Plan by falsely telling Guy "that the plan was a pension plan *** supported by the vehicle of life insurance policies" which "could be sold for cash at any time." In fact, the life insurance policies were owned by "[a] trust created by *** CJA," rather than plaintiffs, and "the policies had no cash value and could not be sold for cash, even if they had been owned by [plaintiffs]." Katz also falsely told Guy that employer contributions to the Plan were tax deductible, when, in fact, the IRS had made "no such rulings" at the time. CJA allegedly provided this false information to Katz and "knew that Katz provided this false

information to G&L." G&L would not have joined the plan if Guy had known that Katz's representations were false.

¶ 18   The complaint further alleged that in "approximately 2007," the IRS ruled that employer contributions to plans such as the one G&L joined were not deductible. CJA and Katz were allegedly aware of this ruling in 2007 but did not inform plaintiffs, thus "continu[ing] in the fraud and conceal[ing] the fraud." Plaintiffs "became aware that they had been defrauded" on November 6, 2014, when the IRS notified G&L that it was denying the deductions taken by G&L for its payments into the Plan for 2008, 2009, and 2010. Plaintiffs sought damages "in the amount of $1,400,000 as reimbursement for the unpaid tax interest and penalties charged, for the exorbitant premiums paid, for interest on the funds wrongly paid out by G&L, and for all of G&L's attorneys fees."

¶ 19   Defendants filed motions for summary judgment, arguing that plaintiffs' claims were time-barred and, in any case, defendants did not make any material misrepresentations of fact.

¶ 20   In support, defendants attached the deposition of Bleiweis, who testified that, although "[n]o living participant can get cash from the Plan," a participant may sell their death benefit to a third party:

> "[Guy] right now has just under, I think, a million five death benefit, guaranteed. He doesn't have to pay any more premiums. And that amount's going to continue to increase each year. He could go to you and say, 'Steve, how much will you give me if I designate you as my beneficiary upon my death? *** How much would you pay me today to get a million five at some unknown date in the future?' "

¶ 21   Bleiweis further testified that, prior to 2001, he advised senior management to solicit outside opinions on the tax deductibility of employer contributions because "this is a gray area of

the law. The IRS hadn't ruled on it prior to this point." CJA received opinions from several law firms concluding, based on existing law, it was "more likely than not" that employer contributions were tax deductible. CJA's marketing employees were authorized to say that "in our opinion, the contributions would be tax deductible" but "were not authorized to state it as a fact."

¶ 22        The Proposal presented to Guy in March 2001 was based on a "template" created by CJA for which Bleiweis "had final say over the wording." Although the Proposal states that "[e]mployers may deduct contributions to the Plan" (emphasis in original), Bleiweis claimed that language "means that employers may be able to deduct contributions to the Plan or they may not. *** I was stating my opinion about the possibility of tax deductions." He acknowledged that the Proposal contains "an illustration of what would happen if the contributions were tax deductible."

¶ 23        "At or about" October 2011, CJA learned that "a number of employers who were in the Plan *** had received audit letters from the IRS," advising them that their tax deductions "were being questioned by the IRS." In response, on October 5, 2011, CJA sent a letter to employers in the Plan, including G&L, advising them that CJA had "learned of the audits." Bleiweis wrote in the letter that CJA was "confident" that the audit would be resolved in the employers' favor because he "thought the plan was designed and operated in such a way to comply with the requirements of the Internal Revenue Code." He acknowledged that CJA stopped marketing the Plan "around the time of the audits," and no new employers joined the Plan after the audits began.

¶ 24        Plaintiffs filed a response in which they cited opinion letters from two expert witnesses. Attorney David Shiner, in a letter to plaintiffs' counsel dated October 13, 2021, wrote that "it is

our opinion that for years 2001 through 2011 excess contributions to the Plan by G&L should be determined to be non-deductible distributions of cash for the benefit of Guy Battista." He explained that sections 419 and 419A of the Internal Revenue Code (I.R.C. §§ 419, 419A) "drastically limit the employer's deduction for a contribution to a welfare benefit fund." Section 419A(f)(6) provides an exception for welfare benefit funds that are part of employer plans consisting of ten or more employees; this exception has been "aggressively tested" and "intensely litigated." Shiner further stated: "[I]t is our opinion that the Plan should not satisfy the requirements of Section 419A(f)(6). *** [F]or years 2001 through 2011, any contribution to the Plan would be deductible only to the extent of the qualified cost of insurance *** and excess contributions would be non-deductible."

¶ 25          Richard Schwartz of Life Insurance Analysts, Inc., was asked by plaintiffs' counsel to give his opinion on a "Certificate of Participation in the [Plan]" stating that the fair market value (FMV) of Guy and Luanne's policies combined was $181,842. In a letter dated October 14, 2021, Schwartz stated that "if there was a life settlement buyer, in my professional opinion that buyer would offer significantly less than the combined FMV of $181,842." He explained that the FMV listed in the certificate was derived based on methodology "typically used for valuing a traditional life insurance policy" that did not take into account the specifics of the Plan, which "would often dissuade a life settlement buyer," since participants in the Plan did not own traditional life insurance policies and the "paid-up promises are not accompanied by a traditional stream of cash surrender values." Additionally, life settlement buyers typically have an expectation of receiving the death benefit in 8 to 10 years, while Guy and Luanne had life expectancies of 23 and 28 years respectively.

¶ 26         On April 23, 2022, the trial court granted defendants' motions for summary judgment. It found plaintiffs' claims were barred by the five-year statute of limitations for common-law fraud, which began to run, at the latest, on September 7, 2011, "when Plaintiffs received written notice from the IRS that the IRS was disallowing deductions for contributions to the Trust, putting Plaintiffs on notice of their alleged injury." The court also found that defendants' representations regarding the tax deductibility of contributions to the Plan were "not actionable for common law fraud" because, in 2001, "the law remained undecided." Thus, "the representation that employers 'may' deduct contributions to the Plan was *** not a statement of fact," but a statement of opinion. Alternatively, "even if the statement was one of fact rather than opinion," plaintiffs presented no evidence to show that defendants knew it was false at the time it was made.

¶ 27         ANALYSIS

¶ 28         Initially, the Katz defendants request that we strike plaintiffs' brief for failure to comply with Supreme Court Rule 341. Under Rule 341(h)(6), an appellant's statement of facts must "contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment." Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020). In contravention of this rule, plaintiffs' statement of facts is replete with arguments and commentary. Since plaintiffs' rule violations do not hinder our review, we decline to strike their brief, but we will disregard the remarks in question. See *Canel & Hale, Ltd. v. Tobin*, 304 Ill. App. 3d 906, 911 (1999).

¶ 29         We review the trial court's grant of summary judgment *de novo* (*Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008)), keeping in mind that summary judgment is appropriate where "there is no genuine issue as to any material fact and *** the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2–1005(c) (West 2018). We construe the record strictly against the movant and liberally in favor of the nonmoving party. *Williams*, 228 Ill. 2d at 417. To prevail,

the nonmoving party must present some evidence that would arguably entitle it to recover at trial. *Keating v. 68th & Paxton, L.L.C.*, 401 Ill. App. 3d 456, 472 (2010).

¶ 30      To prevail in a common-law fraud action, plaintiffs must plead and prove that (1) defendants made a false statement of material fact; (2) defendants knew the statement was false; (3) defendants intended to induce plaintiffs to act; (4) plaintiffs acted in justifiable reliance upon the truth of the statement; and (5) plaintiffs suffered damages as a result. *Metropolitan Capital Bank & Trust v. Feiner*, 2020 IL App (1st) 190895, ¶ 38; *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 496 (1996). As this court has previously observed, there is a split in Illinois authority as to the burden of proof in a fraud claim. *Metropolitan Capital*, 2020 IL App (1st) 190895, ¶ 44 (there are "two diverging lines of first district cases on an issue our supreme court has not specifically addressed"). Some cases require each element to be proved by clear and convincing evidence, while other cases hold that the last two elements (justifiable reliance and damages) need only be proved by a preponderance of the evidence. *Id.* ¶ 40 (collecting cases). We agree with the *Metropolitan Capital* court that "we read nothing in *** any *** controlling authority supporting a split standard of proof." *Id.* ¶ 43. However, our decision on appeal is the same under either standard.

¶ 31                          Statute of Limitations

¶ 32      The trial court ruled that plaintiffs' claim was time-barred by the five-year statute of limitations for fraud, finding that it began to run no later than September 7, 2011, when plaintiffs received a notice from the IRS that their 2008, 2009, and 2010 federal tax returns were being audited. Plaintiffs argue that the statute did not begin to run until 2014, when they received notice from the IRS that their deductions for contributions to the Plan were being denied.

¶ 33      Common-law fraud is typically governed by the five-year limitations period set forth in section 13-205 of the Code of Civil Procedure, which provides that "all civil actions not otherwise provided for, shall be commenced within 5 years next after the cause of action accrued." 735 ILCS 5/13-205 (West 2016); see *Findlay v. Chicago Title Insurance Co.*, 2022 IL App (1st) 210889, ¶ 94. Initially, the Katz defendants argue that, as to them, the correct statute of limitations is two years under section 13-214.4 of the Code of Civil Procedure, which provides:

> "All causes of action brought by any person or entity under any statute or any legal or equitable theory against an insurance producer, registered firm, or limited insurance representative concerning the sale, placement, procurement, renewal, cancellation of, or failure to procure any policy of insurance shall be brought within 2 years of the date the cause of action accrues." 735 ILCS 5/13-214.4 (West 2016).

See also *Scottsdale Insurance Co. v. Lakeside Community Committee*, 2016 IL App (1st) 141845, ¶ 20 (two-year limitations period set forth in section 13-214.4 "encompasses [all] claims by an insured against his insurance agent" (internal quotation marks omitted)). (CJA does not argue that the two-year period applies to itself.) Plaintiffs do not acknowledge or respond to Katz's argument in their briefs aside from stating that the trial court "correctly holds that the statute of limitations for fraud is five years."

¶ 34      When more than one statute of limitations is relevant to a given action, the more specific statute prevails over the more general. *Tosado v. Miller*, 293 Ill. App. 3d 544, 550 (1997). Section 13-205's statute of limitations for civil actions not otherwise expressly provided for by statute is more general than section 13-214.4, which pertains specifically to actions against insurance producers, registered firms, and limited insurance representatives. It is undisputed that Katz, an insurance broker, made representations to Guy regarding the sale of insurance at issue

in this action. Plaintiffs' complaint alleges that Katz "told Guy that G&L could pay for insurance policies for its four non union employees." Katz, in his deposition, acknowledged telling Guy that when a participating employee retired, their policy would be "converted" to a whole life insurance policy owned by that individual. Based on these facts, we find the two-year statute of limitations applies as to the Katz defendants only.

¶ 35        Under Illinois law, the statute of limitations begins to run when "the injured plaintiff knows or reasonably should have known that he has been injured and that his injury was wrongfully caused." *Golla v. General Motors Corp.*, 167 Ill. 2d 353, 361 (1995). At that point, "the burden is upon the injured person to inquire further as to the existence of a cause of action" (*Carlson v. Fish*, 2015 IL App (1st) 140526, ¶ 23 (internal quotation marks omitted)) even though he may not yet be aware of the full extent of his injuries (*Golla*, 167 Ill. 2d at 367). However, "the period of limitations does not commence in the first instance until an injury is incurred. [Citation.] Where no injury has yet occurred, the discovery rule is irrelevant because there is nothing to discover." (Internal quotation marks omitted.) *Khan v. Deutsche Bank AG*, 2012 IL 112219, ¶ 41.

¶ 36        In *Khan*, plaintiffs brought an action for fraud and other related causes of action, alleging that defendants advised them to undertake certain investment strategies to "minimize plaintiffs' federal and state income tax liability" when, in fact, the IRS "had concluded that the transactions were illegal tax shelters." *Id.* ¶ 3. Defendants argued that the statute of limitations began to run, at the latest, in 2003, when plaintiffs received notices from the IRS that their 1999 and 2000 federal tax returns would be audited. *Id.* ¶ 27. Our supreme court rejected this argument and found the statute of limitations did not begin to run until 2008, when the IRS issued a notice of deficiency to plaintiffs. *Id.* ¶ 45. The court explained:

"As of May 2003, no injury had occurred. Plaintiffs had filed their tax returns and claimed tax losses based on the options transactions. At that point, they had received the promised tax benefits. Further, plaintiffs alleged in their complaint that they had been assured by some of the alleged coconspirators that the IRS notices did not apply to them." *Id.* ¶ 42.

¶ 37 Likewise, as of 2011, plaintiffs in the present case had not yet suffered any injury related to the tax treatment of G&L's contributions to the Plan. At that point, they had received the advertised tax benefits. Although the IRS notified plaintiffs that G&L's federal tax returns for 2008, 2009, and 2010 had been "selected for examination," and requested information regarding G&L's contributions to the Plan and "the tax year and line on which such contribution was deducted for federal income tax purposes," no deductions by G&L had yet been disallowed. Moreover, CJA sent plaintiffs a letter stating that it was "confident that your audit will be resolved in your favor." It was not until 2014 that G&L's deductions were denied by the IRS and the statute of limitations began to run. Accordingly, plaintiffs' complaint, filed on June 19, 2017, is not time-barred as to CJA, for which the five-year statute of limitations applies, but is time-barred as to the Katz defendants under the two-year omnibus statute of limitations for insurance brokers.

¶ 38                                   Tax Deductibility of Employer Contributions

¶ 39 Plaintiffs argue there is a material issue of fact as to whether defendants fraudulently induced G&L to join the Plan by falsely representing that employer contributions would be tax deductible.

¶ 40 Defendants respond that their representations regarding the tax treatment of Plan contributions were statements of opinion, not fact, and therefore cannot form the basis of a fraud

claim. *Illinois Non-Profit Risk Management Ass'n v. Human Service Center*, 378 Ill. App. 3d 713, 723 (2008) ("an expression of opinion will not support an action for fraud"). Bleiweis testified that in 2001, the deductibility of Plan contributions was "a gray area of the law," but he "thought the plan was designed and operated in such a way to comply with the requirements of the Internal Revenue Code." His belief was supported by opinion letters from multiple law firms concluding, based on existing law, it was "more likely than not" that the contributions were tax deductible.

¶ 41    Plaintiffs argue that defendants' representations were objectively false in 2001 based on the October 13, 2021 statement by attorney Shiner that "it is our opinion that for years 2001 through 2011 excess contributions to the Plan by G&L should be determined to be non-deductible distributions of cash for the benefit of Guy Battista." However, Shiner explicitly framed his statement as an "opinion" and acknowledged that the relevant section of the Internal Revenue Code has been "aggressively tested" and "intensely litigated." Additionally, Shiner did not limit his analysis to the law as it existed in 2001 but cited subsequently decided authority in support of his conclusion. Under these facts, Shiner's opinion in 2021 does not render defendants' statements in 2001 objectively untrue.

¶ 42    Moreover, even if defendants' representations in 2001 can be construed as statements of fact rather than opinion, there is no evidence to indicate defendants knew they were false when made. See *Metropolitan Capital*, 2020 IL App (1st) 190895, ¶ 38 (plaintiff in common-law fraud action must show that the statement at issue was "known or believed to be false by the party making it" (internal quotation marks omitted)). Katz testified that he believed contributions were tax deductible based on a promotional seminar and materials provided by CJA, as well as "letters of opinion from different firms." Bleiweis believed the Plan "was designed and operated in such

a way to comply with the requirements of the Internal Revenue Code" and, as late as 2011, wrote in a letter to plaintiffs that he was "confident that your audit will be resolved in your favor."

¶ 43    Plaintiffs argue that even if defendants genuinely believed that Plan contributions were "more likely than not" going to be deductible, they falsely represented their level of certainty. The record does not support this contention. Although the Proposal stated that employers could deduct contributions to the Plan, it also prominently stated on the title page: "This is not a contract. It is a proposal based on current assumptions which are not guaranteed."

¶ 44    In addition, the Agreement Guy signed on March 19, 2001 provides: "It is understood and agreed that *** neither the Trustee, Administrator, nor any Insurer or its agents can guarantee or promise that the anticipated favorable tax results will in fact be achieved." Subsequently, on March 31, 2001, Guy signed the Disclaimer, in which he attested: "I understand that the Baltimore Life Insurance Company and its agents, representatives and employees *** made no promises or representations about the tax treatment to be accorded to the Employer's contributions to the Trust *** including whether the contributions may be deducted by the Employer." Guy further attested that he had been "advised to consult independent legal and tax counsel regarding the tax treatment to be accorded the Employer's contributions to the Trust for the purchase of the above-described insurance product(s)," and he had, in fact, done so. Since the record reflects that plaintiffs were consistently advised that tax benefits from joining the Plan were not guaranteed, defendants' opinions regarding the deductibility of Plan contributions are not actionable for fraud. *Illinois Non-Profit Risk Management Ass'n*, 378 Ill. App. 3d at 723.

¶ 45                              Cash Benefit to Plan Participants

¶ 46         Plaintiffs also allege there is a material issue of fact as to whether defendants committed fraud by falsely promising a significant cash benefit to Plan participants during their lifetime. Specifically, according to plaintiffs, defendants "told Guy he would get $138,000 at age 65 when they really didn't know what he might get, if anything."

¶ 47         Initially, CJA argues that this allegation of fraud is forfeited as to itself because, in their fifth amended complaint, plaintiffs do not allege that CJA specifically (as opposed to the Katz defendants) made any representations regarding cash benefits to participants in the Plan. CJA asserts this was a "new theory" raised for the first time in plaintiffs' response to CJA's summary judgment motion. We find that plaintiffs did, in fact, raise this theory of liability in their complaint, in which they allege that "Katz told Guy that the plan was a pension plan because it provided retirement benefits and was advantageous because it was supported by the vehicle of life insurance policies which provided post retirement cash benefits and death benefits." Plaintiffs further allege that "[a]ll the information for the promises made by Katz to G&L was provided to Katz by CJA" and that "CJA knew the information provided to Katz, that Katz provided to G&L was false."

¶ 48         However, plaintiffs have not presented evidence that would arguably entitle them to recover at trial on this issue. See *Keating*, 401 Ill. App. 3d at 472. Guy testified that it was his "understanding" when he joined the Plan that it would provide pension benefits. Both Bleweis and Katz testified that, although the Plan provides only death benefits, it is possible for participants to sell their paid-up death benefits to third parties in exchange for cash. Katz further testified that he relayed this information to Guy as to how he could "get cash out of" the Plan during his lifetime.

¶ 49          Plaintiffs do not dispute that participants in the Plan may obtain cash during their lifetimes by selling their death benefits to third parties, provided they can find a willing buyer. However, they argue that the Proposal fraudulently promised Guy a larger sum of cash than he would be able to obtain from a death benefit buyer. Under the section "Living Settlement Options," the Proposal states: "Should you need funds during your life, a portion of your policy may be sold for cash. *** Any remaining death benefit continues to provide protections for your beneficiary." The section then provides a chart for each of G&L's non-unionized employees displaying, among other categories, "Age," "Total Death Benefit," and "Projected Payment from Settlement." Guy's "Projected Payment from Settlement" at age 65 is $138,750.

¶ 50          Plaintiffs claim this figure is "complete balderdash, [and] a total fraud *** based on nothing." In support, they cite their expert Schwartz's statement that "if there was a life settlement buyer, in my professional opinion that buyer would offer significantly less than the combined FMV [for Guy and Luanne] of $181,842." However, each page of the "Living Settlement Options" provides that "[i]llustrated values are projections only and are not guaranteed. Lifetime settlements are affected by current interest rates, health and age. Assumed values are not guaranteed and may be more or less favorable than these illustrated results." As discussed, "an expression of opinion will not support an action for fraud." *Illinois Non-Profit Risk Management Ass'n v. Human Service Center*, 378 Ill. App. 3d at 723. Because the figures listed in the Proposal are explicitly defined as uncertain projections rather than facts, they cannot form the basis of a fraud claim under Illinois law.

¶ 51          Plaintiffs also argue that the statement "a portion of *your policy* may be sold for cash" (emphasis added) is fraudulent because, per Bleiweis' testimony, participants in the Plan do not own insurance policies. However, there is no indication in the record that Guy relied on this

statement in joining the Plan. See *Metropolitan Capital*, 2020 IL App (1st) 190895, ¶ 38

(plaintiff in fraud action must show that he acted in reliance upon defendants' false statement).

Accordingly, this misstatement does not support an action for fraud.

¶ 52                                    CONCLUSION

¶ 53          For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 54          Affirmed.